FILED

MAY − 9 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

NATIONAL COMMUNITY )
REINVESTMENT COALITION, )
727 15th Street, N.W. )
Suite 900 )
Washington, D.C. 20005 )
)
           Plaintiff, )
)
    v. )    Case No.
)
NOVASTAR FINANCIAL INC., )    Case: 1:07-cv-00861
300 East Lombard Street )    Assigned To : Lamberth, Royce C.
Baltimore, Maryland 21202 )    Assign. Date : 5/9/2007
)    Description: Civil Rights-Non Employ.
and )
)
NOVASTAR MORTGAGE INC., )
8699 Butterfield Avenue )
Richmond, Virginia 23229 )
)
           Defendants. )
)

*JURY ACTION*

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

### NATURE OF THE ACTION

    1.    This Complaint brought by the National Community Reinvestment Coalition (the

"NCRC" or "Plaintiff") arises out of discriminatory lending policies and practices maintained by

Defendants NovaStar Financial Inc. and NovaStar Mortgage Inc. (collectively, "NovaStar").

The NCRC seeks a declaratory judgment, preliminary and permanent injunctive relief, and

damages for NovaStar's unlawful behavior.  This action is brought under the Fair Housing Act of

1968, as amended, 42 U.S.C. § 3601 *et seq.* (the "FHA").

    2.    Plaintiff NCRC is a national non-profit organization with the mission and purpose

of increasing fair and equal access to credit, capital, and banking services and products for all

*1*

Americans, regardless of race, national origin, or disability. NovaStar's discriminatory policies and practices have frustrated the NCRC's mission of increasing the flow of private capital into underserved communities, and have caused the NCRC to expend its scarce resources on educational programs, investigations, and litigation to identify and combat such practices.

3.      NovaStar maintains and publishes two lending eligibility policies that discriminate purposefully and intentionally against Native Americans and people with disabilities. Specifically, NovaStar's underwriting guidelines and policies treat "Properties located on Indian reservations" and "Properties for adult foster care" as "Unacceptable" for its lending business. *See* Excerpts of Program Manual at p. 40, attached at Exh. A. These facially discriminatory policies explicitly treat loan applicants differently based on the protected characteristics of race, color, racial composition, national origin, and disability. In addition, these discriminatory policies have a significant disproportionate adverse impact on Native Americans and people with disabilities.

4.      NovaStar also discriminates against African Americans and African-American homeowners, as well as persons and homeowners living in African-American neighborhoods, in the policies and practices it uses to determine eligibility for mortgage loans. Specifically, NovaStar has a policy and practice of denying all loans for applications secured by row houses in Baltimore (hereinafter "no row house policy"). NovaStar's no row house policy has the purpose and effect of discriminating against African Americans and African-American homeowners, as well as residents and homeowners living in African-American neighborhoods in Baltimore. NovaStar's no row house policy has a similar discriminatory purpose and effect on Latinos and Latino homeowners, as well as residents and homeowners living in Latino neighborhoods in Baltimore.

2

5.      There is no business justification for any of these three discriminatory lending policies and practices. Each policy treats persons protected by the FHA differently from non-protected groups, and each policy has a disproportionate adverse impact on persons protected by the FHA. NovaStar's blanket refusal to make loans secured by properties on Indian reservations or those used for adult foster care discriminates against Native Americans and people with disabilities, without regard to the creditworthiness of the borrower. Applicants who meet traditional lending criteria, such as a strong FICO score, low loan-to-value (LTV) and/or debt-to-income (DTI) ratios, steady income, and significant assets, are excluded from consideration for a loan based solely on whether the property is located on an Indian reservation or the disability of persons intending to reside in the property. Similarly, under NovaStar's no row house policy, applicants are excluded solely on the basis of property type without regard to whether they meet traditional lending criteria.

6.      If NovaStar applied traditional lending criteria, it would significantly reduce the adverse impact on Native Americans and people with disabilities, as well as African- American and Latino homeowners, and homeowners in majority African-American and Latino neighborhoods in Baltimore, without increasing the company's risk exposure.

7.      Upon information and belief, these discriminatory policies and practices have been in place and followed by NovaStar for a number of years and reflect the Defendants' current business practices. These policies and practices constitute continuing violations of the FHA.

8.      NovaStar's discriminatory lending policies and practices have caused, and continue to cause, direct injury to Native Americans and homeowners living on Indian reservations, people with disabilities across the nation, and African-American and Latino

3

residents and homeowners in Baltimore. NovaStar's refusal to provide loans secured by

properties on Indian reservations and properties used for adult foster care limits homeownership

and access to credit to Native Americans, and restricts housing options for people with

disabilities. Its no row house policy impedes African-American and Latino borrowers and

borrowers in African-American and Latino neighborhoods in Baltimore from receiving any loans

at all. NovaStar's discriminatory lending policies and practices have also injured the NCRC by

frustrating its mission of increasing fair and equal access to capital for underserved communities,

and by requiring the NCRC to divert resources to investigate, eliminate, and counteract such

practices.

### PARTIES

9.      Plaintiff NCRC is a national non-profit organization organized under the laws of

the District of Columbia, with its principal place of business located at 727 15th Street NW,

Suite 900, Washington, D.C. 20005. The NCRC was formed in 1990 by national, regional, and

local organizations to develop and harness the collective energies of community reinvestment

organizations from across the country. NCRC members represent and protect traditionally

underserved and vulnerable populations. Its members include community development

corporations, civil rights groups, community reinvestment advocates, local and state government

agencies, and churches. One of the NCRC's primary missions is to increase fair and equal

access to credit, capital, and banking services and products to individuals, regardless of race,

national origin, or disability.

10.     Defendant NovaStar Financial Inc. ("NFI") is a real estate investment fund

incorporated in the State of Maryland and headquartered in Missouri. Through its subsidiaries,

NFI originates primarily single-family, non-conforming loans via a network of wholesale brokers

4

and residential mortgage lenders throughout the nation. NFI provides the underwriting guidelines for its loans and originates, services, and securitizes its loans.

11.    Defendant NovaStar Mortgage, Inc. is incorporated in the State of Virginia and maintains its principal office in Missouri. NovaStar Mortgage, Inc. is a wholly-owned subsidiary of NFI and serves as NFI's primary loan origination unit. As of March 2007, NovaStar Mortgage, Inc. was the 16th largest residential subprime lender in the country.

12.    Each of the Defendants was and is the agent, employee, and representative of the other Defendant. Each Defendant, in doing the acts or in omitting to act as alleged in this Complaint, was acting in the course and scope of its actual or apparent authority pursuant to such agencies, or the alleged acts or omissions of each Defendant as agent were subsequently ratified and adopted by each agent as principal.

## JURISDICTION AND VENUE

13.    This Court has jurisdiction over this matter pursuant to 42 U.S.C. §§3613, and 28 U.S.C. §§1331, 1343, because the claims alleged herein arise under the laws of the United States. Venue is proper in the District of Columbia because Plaintiff NCRC has its principal place of business in the District and NovaStar Mortgage, Inc. and NFI, through its subsidiaries, conduct business in the District.

## FACTS

### A.    NovaStar's Nationwide No Indian Reservation Policy

14.    NovaStar maintains and publishes a policy that prohibits making loans secured by dwellings on Indian reservations across the country ("no Indian reservation policy"). Exh. A at 40. NovaStar's no Indian reservation policy is facially discriminatory based on race, color, racial composition, and/or national origin of the area in which the property is located, and

5

explicitly treats loan applicants differently based on race, color, racial composition, and/or national origin.

15.     In addition to treating loan applicants differently on a prohibited basis, NovaStar's no Indian reservation policy has a significant disproportionate adverse impact on Native Americans and Native American homeowners. According to 2000 Census data, 41.7% of Native American homeowners live on Indian reservations. By comparison, only 1.8% of white homeowners live on Indian reservations. Consequently, NovaStar's no Indian reservation policy excludes 41.7% of Native American homeowners from obtaining a loan from NovaStar, but only 1.8% of white homeowners, a ratio of more than twenty-three to one.

16.     NovaStar's no Indian reservation policy has the purpose and effect of limiting access to capital for Native Americans and Native American homeowners, and also limits the availability of housing to Native Americans. Indian reservations exist in thirty-five (35) states. *See* 2000 Census Map of Indian Reservations, attached as Exh. B. NovaStar lends in all of these states except Utah and Louisiana. *See* www.novastarhome.com/wherewelend.nsp. According to 2000 Census data, Native Americans constitute 55% of the population of Indian reservations throughout the country. Whereas Whites constitute only 33.7% of the reservation population. On certain larger Indian reservations, however, the percentage of the population that is Native American is even higher. For example, the Navajo Nation Reservation in Arizona has a Native American population of 96.4% compared with a white population of 2.2%; the Eastern Cherokee Reservation in North Carolina has a Native American population of 82.4% compared with a white population of 12.9%; and the Fort Peck Reservation in Montana has a Native American population of 62% compared with a white population of only 34.9%.

17.     There is no business justification for NovaStar's no Indian reservation policy.

6

Under this policy, NovaStar excludes loans without regard to traditional lending criteria. Applicants with substantial assets, a strong FICO score, a low LTV and/or DTI ratio, and steady income, would not qualify for a loan of any size based solely on the fact that their property is located on an Indian reservation. This policy intentionally treats Native Americans and Native American homeowners differently from non-Native American persons and homeowners, and has a significant disproportionate adverse impact on residents and homeowners on Indian reservations. If NovaStar applied traditional lending criteria, it would significantly reduce the adverse impact its policy has on Native Americans without increasing the company's risk exposure.

### B.    NovaStar's Nationwide No Adult Foster Care Policy

18.    NovaStar maintains and publishes a nationwide policy that prohibits making loans secured by dwellings used for adult foster care ("no adult foster care policy"). Exh A at 40. The U.S. Department of Health and Human Services (HHS) defines adult foster care as that "intended for adults with mental, sensory, and physical impairments," which "typically serves as an alternative to other more restrictive types of residential care." *See* www.acf.hhs.gov/programs/ocs/ssbg/docs/ssbg_focus_2003/older_adults.html. This definition is typical of that used by many state agencies across the country. Michigan's Department of Human Services, for example, defines adult foster care homes as "residential settings that provide 24-hour personal care, protection, and supervision for individuals who are developmentally disabled, mentally ill, physically handicapped or aged who cannot live alone but who do not need continuous nursing care." *See* http://www.hslic.utah.gov/adultfostercare.htm. Similarly, Utah's Office of Licensing defines adult foster care as "the provision of care in homes which are conducive to the physical, social, emotional and mental health of disabled or elderly

7

adults who are temporarily unable to remain in their own homes." *See*

http://www.hslic.utah.gov/adultfostercare.htm. Likewise, Minnesota defines foster care for

adults as "a program operating 24 hours a day that provides functionally impaired adults with

food, lodging, protection, supervision, and household services in a residence." *See* MINN. STAT.

§ 245A.02 (2006). NovaStar's no adult foster care policy is thus facially discriminatory based

on disability, and explicitly treats loan applicants differently based on their association with, or

residing with, persons with disabilities. Because NovaStar's no adult foster care policy excludes

homes typically licensed for people with disabilities, by definition it also has a significant

disproportionate adverse impact on loan applicants associated with, or living with, persons with

disabilities.

19.     NovaStar's no adult foster care policy has the purpose and effect of limiting

access to capital for loan applicants based on their association with, or residing with, persons

with disabilities, and also limits the availability of housing to persons with disabilities.

According to 2000 Census data, 49.7 million people (19.3% of the population), have some type

of "long lasting condition or disability." *See* www.censys.gov/prod/2003/pubs/c2kbr-17.pdf. As

the percentage of the population 65 and older increases, the number of people with disabilities

will increase as well, making even greater the need for loans secured by adult foster care homes.

*See* www.census.gov/population/projections/nation/summary/np-t3-c.pdf.

20.     There is no business justification for NovaStar's no adult foster care policy.

Under this policy, NovaStar excludes loans without regard to traditional lending criteria.

Applicants with substantial assets, a strong FICO score, a low LTV and/or DTI ratio, and steady

income, would not qualify for a loan of any size based solely on the fact that their property will

be used as an adult foster care home. This policy intentionally treats dwellings that house people

with disabilities differently from dwellings that do not house such persons, and has an adverse disparate impact on people with disabilities. If NovaStar employed traditional lending criteria, it would significantly reduce the adverse impact on people with disabilities by increasing the capital available to owners of adult foster care homes without increasing the company's risk exposure.

### C.    NovaStar's No Row House Policy In Baltimore

21.    In major metropolitan areas across the nation, residential housing patterns remain highly segregated by race. The vast majority of African Americans in urban areas reside in majority black census tracts, while the vast majority of white residents reside in majority white census tracts. In major cities across the nation, such as Baltimore, racial segregation is starkly defined by neighborhood; very few mixed or integrated neighborhoods exist.

22.    The metropolitan statistical area ("MSA") of Baltimore-Towson, MD consists of Anne Arundel County, Baltimore County, Baltimore City, Carroll County, Harford County, Howard County, and Queen Anne's County. After decades of white flight from Baltimore City, the Baltimore-Towson MSA remains highly segregated. According to 2005 census estimates, African Americans constitute 65.2% of the total population of Baltimore City. In contrast, African Americans in Baltimore County, which almost completely surrounds Baltimore City, constitute only 24% of the population. Two-thirds of African Americans in this MSA (67%) reside in majority black census tracts, and nearly 95% of white residents live in majority white census tracts.

23.    Property type is also strongly correlated to the racial composition of neighborhoods in Baltimore City. Upon information and belief, nearly two-thirds of all row houses in Baltimore City are occupied by African Americans, and the majority of row houses are

located in African-American neighborhoods.

24.     NovaStar maintains a discriminatory policy and practice of denying its loan products to any applicant with a row house in Baltimore. Under this no row house policy, NovaStar automatically rejects any applicant, without regard to traditional lending criteria, based solely on the type of dwelling securing the loan. Thus, for example, a loan applicant in Baltimore with a row house, despite having substantial assets, a strong FICO score, a low LTV and/or DTI ratio, and steady income, would not qualify for a loan of any size. This policy intentionally treats African-American homeowners and predominantly African-American neighborhoods in Baltimore differently from non-African-American homeowners and neighborhoods in Baltimore, and has a disproportionate adverse impact on African Americans and persons living in predominantly African-American neighborhoods in the City of Baltimore. NovaStar's no row house policy has a similar discriminatory purpose and effect on Latinos and residents of Latino neighborhoods in Baltimore.

25.     In January 2006, a tester for the NCRC called NovaStar and told the agent that he was interested in information about a loan to purchase a house in Baltimore. The NovaStar agent asked what type of house he was buying and asked for the location of the house. After the tester stated that the house was a row house, the agent stated that the company had stopped financing row houses a few months before the tester's call. The agent asked where the house was located, and then asked a colleague if he knew where the house was located. After looking up the address, the agent informed the tester that "we don't do row houses in Baltimore."

26.     In February 2006, another tester for the NCRC called NovaStar and requested information about financing a row house in Baltimore. The NovaStar agent who answered the call stated that the company was not currently financing row houses in Baltimore. Upon

10

information and belief, NovaStar has continued to enforce this policy up to the present time.

27. There is no business justification for NovaStar's no row house policy. If NovaStar employed traditional lending criteria, rather than an applicant's property type, it would significantly reduce the adverse impact that this policy has on African-American and Latino homeowners and homeowners in majority African-American and Latino neighborhoods in Baltimore without increasing the company's risk exposure.

28. On March 16, 2006, the NCRC filed a complaint with the Department of Housing and Urban Development (HUD) alleging that NovaStar's no row house policy violated the FHA. As of May 9, 2007, HUD had not issued a determination on this complaint.

## INJURY CAUSED BY DEFENDANTS' POLICIES AND PRACTICES

29. Through numerous workshops, conferences, systemic testing, reports, education and outreach, and "best practice" compliance initiatives, the NCRC has provided education, training, and technical assistance to its members, community organizations, and advocates at the local, regional, and national level to promote fair lending and access to capital in low-income and minority communities across the country. The unlawful discriminatory policies and practices of NovaStar identified above have injured the NCRC by: (a) interfering with those efforts and programs of the NCRC intended to promote fair lending; and (b) requiring the NCRC to commit scarce resources, including substantial staff time, to investigate complaints and to review NovaStar's lending practices, including its three discriminatory policies that adversely affect minorities and people with disabilities.

30. The NCRC has devoted and continues to devote significant resources to addressing lending discrimination against Native Americans, people with disabilities and minorities affected by discriminatory policies. In May 2003, the NCRC and the Native

11

American Indian Housing Council (NAIHC) conducted a survey of Native Americans on Indian reservations to determine areas where abusive and discriminatory lending to Native Americans was most prominent. The NCRC and NAIHC later issued a report in June 2003 with these survey results and began a campaign that continues to this day to educate the public about lending discrimination against Native Americans and the need for greater access to capital for Native Americans, particularly those on Indian reservations. The NCRC has also worked and continues to work with member organizations advocating for people with disabilities and racial minorities to educate and counsel the public about discriminatory lending policies and practices. The NCRC's efforts include working with businesses and consumers to address the effects of discriminatory lending and/or predatory lending in communities with less access to capital.

31.     NovaStar's discriminatory lending policies and practices have required the NCRC to engage in an education and outreach campaign, and to develop educational materials to identify and counteract the unlawful actions of NovaStar, thus diverting the NCRC's resources from other testing, education, counseling, and capacity-building services. Defendants' discriminatory lending policies and practices have also frustrated the NCRC's mission and purpose of increasing fair and equal access to credit, capital, and banking services and products for all Americans, regardless of race, national origin, or disability. Defendants' discriminatory lending policies and practices have required the NCRC, and will require the NCRC in the future, to spend additional resources to counteract NovaStar's discriminatory conduct.

32.     As a result of Defendants' discriminatory conduct, individuals in the communities served by the NCRC have been: (a) discouraged from applying for loans; and (b) deprived of equal access to credit, capital, and banking services and products. As a result of Defendants' discriminatory conduct, communities served by the NCRC and its member

12

organizations have been denied the flow of capital, the provision of banking services, and the economic growth that accompanies capital and banking services. In response, the NCRC has made substantial efforts and expended considerable resources to investigate the existence and effects of NovaStar's lending policies and to ensure equal lending opportunities for potential borrowers.

33.    The NCRC has been, and continues to be, adversely affected by the acts, policies, and practices of Defendants and/or their respective agents.

34.    The acts, policies, and practices of Defendants set forth herein constitute continuing violations of the FHA. Unless enjoined, NovaStar will continue to engage in the unlawful acts and practices described above.

35.    Defendants' unlawful actions described above were, and are, intentional and willful, and/or have been, and are, implemented with callous and reckless disregard for the federally protected rights of the NCRC, its constituent members, and the individuals and communities it serves.

## CAUSE OF ACTION
(Federal Fair Housing Act)

36.    Plaintiff repeats and incorporates by reference all allegations contained in Paragraphs 1 through 35 as if fully set forth herein.

37.    Defendants' acts, policies, and practices, including those through its agents, as described herein, violate the Fair Housing Act, as amended, 42 U.S.C. §§ 3604(a), (b), (c), and (f) and 3605:

13

(a)    Defendants' acts, policies, and practices, have made and continue to make housing unavailable on the basis of race, color, and/or national origin, in violation of 42 U.S.C. § 3604(a);

(b)    Defendants' acts, policies, and practices, have provided and continue to provide different terms, conditions, and privileges of sale of housing, as well as different services and facilities in connection therewith, on the basis of race, color, and/or national origin, in violation of 42 U.S.C. § 3604(b);

(c)    Defendants' published policies and statements have expressed and continue to express a preference on the basis of race, color, handicap, and/or national origin, in violation of 42 U.S.C. § 3604(c);

(d)    Defendants' acts, policies, and practices, have made and continue to make housing unavailable on the basis of handicap, in violation of 42 U.S.C. § 3604(f)(1);

(e)    Defendants' acts, policies, and practices, have provided and continue to provide different terms, conditions, and privileges of sale of housing, as well as different services and facilities in connection therewith, on the basis of handicap, in violation of 42 U.S.C. § 3604(f)(2); and

(f)    Defendants' acts, policies, and practices, have provided and continue to provide different terms, conditions and privileges on the basis of race, color, handicap and/or national origin in connection with the making of real estate-related transactions, in violation of 42 U.S.C. § 3605.

14

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury on all issues so triable as of right.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that the Court grant it the following relief:

(1)     enter a declaratory judgment that the foregoing acts, policies, and practices of the Defendants violate the Fair Housing Act of 1968, as amended, 42 U.S.C. § 3601 *et seq;*

(2)     enter a preliminary injunction enjoining the Defendants and their directors, officers, agents and employees from continuing to publish, implement, and enforce the illegal, discriminatory conduct described herein pending the entry of a final judgment in this matter;

(3)     enter a permanent injunction enjoining the Defendants and their directors, officers, agents and employees from continuing to publish, implement, and enforce the illegal, discriminatory conduct described herein and directing the Defendants and their directors, officers, agents and employees to take all affirmative steps necessary to remedy the effects of the illegal, discriminatory conduct described herein and to prevent similar occurrences in the future;

(4)     award compensatory damages to Plaintiff in an amount to be determined by the jury that would fully compensate Plaintiff for the diversion of resources and frustration of mission that have been caused by the conduct of the Defendants alleged herein;

(5)     award punitive damages to Plaintiff in an amount to be determined by the jury that would punish the Defendants for the willful, wanton and reckless conduct alleged herein and that would effectively deter similar conduct in the future;

(6)     award Plaintiff its reasonable attorneys' fees and costs pursuant to 42 U.S.C.

15

§§ 3613(c)(2); and

(7)    order such other relief as this Court deems just and equitable.


May 9, 2007.

John F. Relman          (Bar No.  405500)
Bradley H. Blower       (Bar No.  421112)
Elena Grigera           (Bar No.  491678)
RELMAN & DANE, PLLC
1225 19th Street NW, Suite 600
Washington, DC 20036
(202) 728-1888
(202) 728-0848 (fax)
jrelman@relmanlaw.com
bblower@relmanlaw.com
egrigera@relmanlaw.com

*Attorneys for Plaintiff*


16

**Exhibit A**

Program Manual





# Program Manual

**Effective February 6, 2007**

Effective 02/06/07

07 0861

# FILED

MAY – 9 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Program Manual



# Table of Contents

**Welcome to NovaStar**

## Chapter 1 – Mortgage Loan Submission

1.1     Using NovaStar's Automated Underwriting System (NovaStarIS)
1.2     Loan Submission
1.3     Interest Rate Lock-In
1.4     Credit Grade Amendment
1.5     Product Change
1.6     Fees
1.7     Third Party Originations
1.8     Net Tangible Benefit

## Chapter 2 – Credit

2.1     Type of Credit Report Required
2.2     Credit Grading
2.3     Minimum Credit Requirements
2.4     Qualifying Rates
2.5     Credit Score Analysis
2.6     Verification of Mortgage/Rent
2.7     No Housing History
2.8     Borrower(s) Who Already Own Real Estate
2.9     Payment Shock
2.10    Standard Automated DTI Exceptions
2.11    Installment Loans
2.12    Collections, Judgments, Charge-off, Tax Liens and Repossessions
2.13    Bankruptcies
2.14    Foreclosures/Notice of Default (NOD)/Forbearance
2.15    Consumer Credit Counseling Services
2.16    Lease/Rent with Option to Purchase (Owner-occupied only)
2.17    Rent Credits
2.18    Installment Land Contract/All Inclusive Trust Deed
2.19    Mortgage/Rents Held by Private Parties
2.20    Co-Signed Obligations
2.21    Deferred Student Loans

Program Manual



# Table of Contents

### Chapter 3 – Income

3.1    Full Documentation
3.2    Limited Documentation
3.3    Stated Income
3.4    NINA/No Doc
3.5    Employment by a Relative
3.6    Income Analysis (Income Documentation Requirements Table)
3.7    Part-Time/Seasonal/Second Job Income
3.8    Unemployment and Welfare Benefits
3.9    Notes Receivable
3.10   Trust Income
3.11   Pension Income
3.12   VA Benefits
3.13   Disability Income
3.14   Mortgage Interest Differential Payments
3.15   Car Allowances
3.16   Trailing Spouse Income
3.17   Deferred Income
3.18   Future Raises
3.19   Disposable Income
3.20   Non-Occupant Co-Mortgagor

### Chapter 4 – Assets

4.1    Verification of Funds
4.2    Gift Funds
4.3    Gifts of Equity
4.4    Funds Borrowed Against Other Assets
4.5    Sale of Other Assets
4.6    Bridge Loans
4.7    IRA/Keogh/401K
4.8    Relocation Packages
4.9    Subordinate Financing
4.10   Contributions or Secondary Financing by Non-Profit Agencies
4.11   Silent Seconds
4.12   Ineligible Sources of Down Payment
4.13   Reserve Requirements
4.14   Seller Concessions

Program Manual



# Table of Contents

## Chapter 5 – Collateral and Appraisal Requirements

5.1    Acceptable Property Types
5.2    Minimum Value Requirements
5.3    Unacceptable Property Types
5.4    Documentation
5.5    Appraisal Updates
5.6    Appraiser Qualification Requirements
5.7    Condominiums
5.8    Modular Homes
5.9    HUD Homes
5.10   Acreage, Unique Homes, and Rural Properties
5.11   Multiple Parcels/Multiple Tax ID Numbers
5.12   Land to Value Ratios
5.13   Leaseholds
5.14   New Construction
5.15   Two to Four Family Units
5.16   Concentration/Density Limitations
5.17   Documented Improvements
5.18   Prior Transfers
5.19   Security Bars
5.20   Mixed Use
5.21   Property Rights Appraised
5.22   Review Appraisal and Second Appraisal Requirements
5.23   Property Identification
5.24   Neighborhood
5.25   Neighborhood Analysis
5.26   Present Land Use
5.27   Predominant Value
5.28   Age of Subject Property
5.29   Site View
5.30   Environmental Reports
5.31   Utilities and Streets
5.32   Highest and Best Use
5.33   Improvements
5.34   Floor Plans/Building Sketches
5.35   Structure
5.36   Permanent Heat Source
5.37   Improvement Analysis
5.38   Remaining Economic Life
5.39   Valuation Analysis

Program Manual



## Table of Contents

5.40    Square Footage
5.41    Amenities/Extras/Special Items
5.42    Deferred Maintenance
5.43    Depreciation
5.44    Market Data
5.45    Prior Sale/Listing History
5.46    Comparables
5.47    Adjustments to Comparables
5.48    Time Adjustments
5.49    Sale or Financing Concession
5.50    Comments and Final Reconciliation
5.51    Sales Price Discrepancy
5.52    Minimums

**Chapter 6 – Miscellaneous**

6.1    Escrow Holdbacks
6.2    Age of Documents
6.3    Ownership
6.4    Loans to Customers and Their Employees
6.5    Legal Resident Aliens
6.6    Foreign National Program
6.7    Maximum LTV and Loan Amounts
6.8    Ownership Seasoning Requirements
6.9    Cash-Out Refinances
6.10   Non-Arm's Length Transaction
6.11   Inherited/Gifted Properties
6.12   Number of Loans to One Person
6.13   Refinancing Zero or Low Interest Rate Loans
6.14   Home Improvement Policy

**Chapter 7 – Closing Procedures**

7.1    Closing Procedure for Loans Closed in NovaStar's Name
7.2    Closing Procedure for Loans Closed in Your Name with Docs Prepared by NovaStar
7.3    Hazard Insurance
7.4    Flood Insurance
7.5    Wind Insurance

Program Manual



# Table of Contents

7.6   Title Commitment
7.7   Power of Attorney
7.8   Leasehold Property
7.9   Truth-in-Lending/Rescission
7.10  Prepayment Penalties
7.11  Maximum Points/Fees
7.12  Texas Cash Out Transactions
7.13  Escrow Closing States
7.14  Natural Disasters

## Chapter 8 – Correspondent Loan Transactions/Closed Loan Purchases

8.1   Correspondent Approval Process
8.2   Delivery Requirements
8.3   Locking/Pricing
8.4   Loan Documents
8.5   Closing the Loan
8.6   First Payment Due NovaStar
8.7   Borrower Notification by Correspondent
8.8   Servicing
8.9   Hazard Insurance/Flood Insurance
8.10  Flood Certification
8.11  Tax Service Contracts

## Chapter 9 – Payment Option ARM Guidelines

9     Payment Option ARM Guidelines

## Chapter 10 – Interest Only Guidelines

10    Interest Only Guidelines

Program Manual



### 5.2    Minimum Value Requirements

NovaStar's minimum property value requirements are:

> ➤ U. S. Citizens and Resident Aliens:  None

> ➤ Non-Resident Aliens:               $75,000

> ➤ Piggyback Program:                 $75,000

### 5.3    Unacceptable Property Types

NovaStar will **not** make loans secured by the property types listed below:

> ➤ Properties secured by Habitat for Humanity loans.  (Revised 1/9/07)

> ➤ Properties subject to a life estate.               (Revised 1/9/07)

> ➤ Rural properties in Alaska.                        (Revised 5/16/06)

> ➤ Stated, NINA and NoDoc loans in the state of Ohio.

> ➤ Properties in default or foreclosure where the loan is a non-arms length transaction and may be considered a bail-out.   (Revised 7/24/06)

> ➤ Properties in Alabama on which a foreclosure has been completed within the 12 months prior to NovaStar closing a new loan on the property (due to redemption period required by state statute).

> ➤ Relocated homes.

> ➤ Manufactured/mobile housing and manufactured/mobile homes with stick-built additions.

> ➤ Commercial use or a mix of commercial/residential properties (home-based business may be acceptable depending on the type of business).

> ➤ Time-share units.

> ➤ Cooperative units.

Continued . . .



**Program Manual**

**Unacceptable Property Types** continued . . .

> ➢ Properties currently listed for sale.

Note: Properties that have been listed for sale in the preceding 12 months may be acceptable, with evidence that the listing has expired or been cancelled at least 90 days before submission. Properties listed for sale within the last 90 days are unacceptable. A satisfactory explanation must be included describing why the property was listed and a copy of MLS to verify the most recent listing price, any listing reductions and length of time listed. Value will be based on the lesser of the appraised value or last listing price. Other restrictions may apply.
(Revised 1/9/07)

> ➢ Unimproved or raw land.

> ➢ Earth homes.

> ➢ Geodesic domes.

> ➢ Floating homes.

> ➢ Cross-collateralized properties that are not adjacent to each other.

> ➢ Homes that appear to be a major over-improvement or are atypical for the area.

> ➢ Properties located on Indian reservations.

> ➢ Single-family residences with less than 750 sq. ft. living space, without market support.

> ➢ Condominiums with less than 500 sq. ft. living space, without market support.

> ➢ Boarding/Rooming Houses, including Bed and Breakfast Inns.

> ➢ Properties used for adult foster care.

> ➢ Properties used for illegal purposes.

> ➢ Properties that cannot be completely rebuilt due to zoning restrictions.

> ➢ Working Farms.

> ➢ Condominium projects with less than 5 units.

> ➢ Condominium conversion projects where the HOA has not been turned over to the home owners for at least one year and/or does not meet all other NovaStar condominium guidelines.
> (Revised 8/15/06)

**Exhibit B**



American Indian Reservations

MAP KEY

■ Federal American
Indian Reservations

· State American
Indian Reservations

07 0861
FILED

MAY - 9 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

*02-861*
*RCL*

JS-44
(Rev.1/05 DC)

## CIVIL COVER SHEET

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| National Community Reinvestment Coalition | NovaStar Financial Inc.; NovaStar Mortgage Inc. |

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF** 11001
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF
LAND INVOLVED

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**

John P. Relman
Bradley H. Blower
Elena Grigera
RELMAN & DANE, PLLC
1225 19th Street NW, Suite 600
Washington, DC 20036
(202) 728-1888

Case: 1:07-cv-00861
Assigned To : Lamberth, Royce C.
Assign. Date : 5/9/2007
Description: Civil Rights-Non Employ.

JURY ACTION

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

- O 1 U.S. Government Plaintiff
- (O) 3 Federal Question (U.S. Government Not a Party)
- O 2 U.S. Government Defendant
- O 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | O 1 | O 1 | Incorporated or Principal Place of Business in This State | O 4 | O 4 |
| Citizen of Another State | O 2 | O 2 | Incorporated and Principal Place of Business in Another State | O 5 | O 5 |
| Citizen or Subject of a Foreign Country | O 3 | O 3 | Foreign Nation | O 6 | O 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
**(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)**

| O A. *Antitrust* | O B. *Personal Injury/ Malpractice* | O C. *Administrative Agency Review* | O D. *Temporary Restraining Order/Preliminary Injunction* |
|---|---|---|---|
| ☐ 410 Antitrust | ☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Medical Malpractice<br>☐ 365 Product Liability<br>☐ 368 Asbestos Product Liability | ☐ 151 Medicare Act<br><br>**Social Security:**<br>☐ 861 HIA ((1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g)<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)<br>**Other Statutes**<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 890 Other Statutory Actions (If Administrative Agency is Involved) | Any nature of suit from any category may be selected for this category of case assignment.<br><br>*(If Antitrust, then A governs)* |

| O E. *General Civil (Other)* | OR | O F. *Pro Se General Civil* |
|---|---|---|

| | | |
|---|---|---|
| **Real Property**<br>☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent, Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property<br><br>**Personal Property**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | **Bankruptcy**<br>☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br><br>**Prisoner Petitions**<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br><br>**Property Rights**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark<br><br>**Federal Tax Suits**<br>☐ 870 Taxes (US plaintiff or defendant<br>☐ 871 IRS-Third Party 26 USC 7609 | **Forfeiture/Penalty**<br>☐ 610 Agriculture<br>☐ 620 Other Food &Drug<br>☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 RR & Truck<br>☐ 650 Airline Regs<br>☐ 660 Occupational Safety/Health<br>☐ 690 Other<br><br>**Other Statutes**<br>☐ 400 State Reapportionment<br>☐ 430 Banks & Banking<br>☐ 450 Commerce/ICC Rates/etc.<br>☐ 460 Deportation | ☐ 470 Racketeer Influenced & Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Satellite TV<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/ Exchange<br>☐ 875 Customer Challenge 12 USC 3410<br>☐ 900 Appeal of fee determination under equal access to Justice<br>☐ 950 Constitutionality of State Statutes<br>☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act |

(2)

| ○ G. *Habeas Corpus/ 2255* | ○ H. *Employment Discrimination* | ○ I. *FOIA/PRIVACY ACT* | ○ J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex,<br>national origin,<br>discrimination, disability<br>age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br><br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted<br>Student Loans<br>(excluding veterans) |

| ○ K. *Labor/ERISA (non-employment)* | ○ L. *Other Civil Rights (non-employment)* | ○ M. *Contract* | ○ N. *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting &<br>Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights<br>Act)<br>☒ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-<br>Employment<br>☐ 446 Americans w/Disabilities-<br>Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment &<br>Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of<br>Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting<br>(if Voting Rights Act) |

**V. ORIGIN**

◉ 1 Original Proceeding  ○ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi district Litigation  ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

42 U.S.C. §§ 3604 (a) (b) (c) and (f) and 3605. Defendants' policies discriminate on the basis of race, ethnicity, and disability in violation of the FHA.

| **VII. REQUESTED IN COMPLAINT** | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | **DEMAND $** _____ <br> **JURY DEMAND:** | Check YES only if demanded in complaint<br>YES ☒    NO ☐ |
|---|---|---|---|

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    YES ☐    NO ☒    If yes, please complete related case form.

DATE  5/9/2007            SIGNATURE OF ATTORNEY OF RECORD  *[signature]*

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.  COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.  CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.  CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.  CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

