**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **NATIONAL COMMUNITY REINVESTMENT COALITION**, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 1:07-cv-00861 (RCL) |
| **NOVASTAR FINANCIAL, INC.**, | ) ) ) | |
| and | ) ) | |
| **NOVASTAR MORTGAGE, INC.**, | ) ) ) | |
| Defendants. | ) ) | |

**PLAINTIFF'S OPPOSITION TO MOTION TO FILE ANSWER OUT OF TIME AND REPLY BRIEF IN SUPPORT OF MOTION FOR ENTRY OF DEFAULT**

Defendants NovaStar Financial, Inc. ("NovaStar Financial") and NovaStar Mortgage, Inc. ("NovaStar Mortgage") (collectively "Defendants") jointly filed a motion under Rule 6(b)(1)(B) permitting them to file their Answer out of time ("Motion to Answer"). As a part of their Motion to Answer, they also asked the Court to deny Plaintiff's Motion for Entry of Default which is based on Defendants' failure to file a timely Answer. The Court should deny Defendants' Motion to Answer and enter a default given Defendants' failure to provide grounds for excusable neglect.

Defendants assert that the failure to file an Answer was an inadvertent oversight and that as soon as counsel "became aware of the matter, he immediately contacted counsel for plaintiff . . . ." Motion to Answer at ¶¶ 3, 4. Defendants claim that when the primary attorney at Weiner Brodsky Sidman Kider PC handling the matter left, the remaining counsel on the case

failed to properly schedule a time to file an Answer to the Complaint. *Id.* at ¶ 6.  Defendants attach their proposed Answer as Exhibit A to their Motion to Answer.

### **Motion To Answer**

Defendants do not meet the Rule 6(b)(1)(B) standard for an extension of time to file an Answer.  First, they do not even acknowledge that they only discovered their failure to file a timely Answer when they received Plaintiff's Motion for Entry of Default, but instead state that they moved to correct as soon as they became aware of the matter.  Motion to Answer at ¶ 4.  Second, the only excuse offered – failure to schedule the due date – does not constitute "excusable neglect" in this district.  *Institute for Policy Studies v. United States Central Intelligence Agency*, 246 F.R.D. 380, 383-384 (D.D.C. 2007).  Excusable neglect is a requirement under Rule 6(b)(1)(B).  In *Institute for Policy Studies,* the court rejected the same excuse given here and denied the motion to enlarge, finding that defendant's "mis-calendering of the due date" was not excusable neglect.  *Id. at 383; see also D.A. v. District of Columbia*, 2007 WL 4365452 at *3 (D.D.C. Dec. 6, 2007)(court deemed defendants' motion for partial dismissal conceded, finding that an overloaded docket was not excusable neglect for plaintiff's counsel's failure to file a timely opposition).

In reviewing the four factors designated by the Supreme Court for evaluating excusable neglect in *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993), the court in *Institute for Policy Studies* held that the single most important factor was whether the reason for the delay was in the "reasonable control of the movant [defendant]." *Id.*  The court found that even where the other three *Pioneer* factors - prejudice, length of the delay and whether there was bad faith - favor granting the defendant's motion for enlargement, defendant's fault alone was a sufficient ground for denial.  *Id.* at 384 ("[t]he case law from this court is

replete with examples of untimely filings being rejected where the only triggering *Pioneer* factor was, as is the case here, a mistake made by counsel").

The Motion to Answer should be denied as well because of prejudice to plaintiff. Plaintiff filed its case on May 9, 2007. Now, almost a year later, after Defendants vigorously defended the case by filing a Motion to Dismiss, they have delayed this case further by failing to timely file an Answer. In the intervening year, both Defendants' financial conditions have deteriorated dramatically, and by their own admission, they may have to file for bankruptcy. The Defendants admit their precarious financial conditions in NovaStar Financial's 2007 Annual Report filed with the Securities and Exchange Commission on April 1, 2008 ("Annual Report"). In the Annual Report, NovaStar Financial states that:

> A significant risk to our operations is the risk that we will not have enough cash and liquidity available to operate our business and meet our debt payment and other obligations. We currently face substantial liquidity risk and uncertainty, near-term and otherwise, which threatens our ability to continue as a going concern and avoid bankruptcy.

Annual Report at 5 ("Liquidity Risk"), excerpts of Annual Report attached as Attachment A. NovaStar Financial acknowledges that its "wholly owned subsidiary NovaStar Mortgage, Inc." has outstanding debt which NovaStar Financial has guaranteed. *Id.* at 9. NovaStar Financial also admits that judgment creditors of NovaStar Mortgage recently attempted to force the mortgage company into bankruptcy. *Id.* at 85 ("Contingencies – American Interbanc Mortgage Litigation"). NovaStar Mortgage was only able to avoid involuntary bankruptcy by entering into a March 17, 2008 settlement, in which it agreed to pay more than $2 million to the judgment creditors.[1] Defendants' deteriorating financial condition demonstrates that the additional time to

---

[1] The judgment creditors are plaintiffs who prevailed in a jury trial and obtained $46.1 million in treble damages against NovaStar Mortgage and two other lenders in California on false advertising and unfair competition claims. *Id.*

Answer will further prejudice plaintiff's ability to collect on a judgment and to redress the injury alleged in the Complaint.

Although courts have shown more leniency in allowing an untimely filing where a counsel mistake will lead to a default judgment, s*ee*, *e.g., D.A.*, 2007 WL 4365452 at \*5, there are limits to this discretion, particularly where a sophisticated financial services law firm is involved that has vigorously defended the litigation prior to the untimely filing.  Further, denial of the Motion to Answer would *not* result in a default judgment, but is merely the first step of the default process, an entry of default by the clerk upon direction by the Court.  After entry of default, plaintiff would then have to move for a default judgment under Rule 55(b)(2) before the default would be considered a final judgment.  The second step of the process, a Rule 55(b)(2) motion, would allow Defendants to more fully and completely explain their failure to timely file before the Court entered a judgment.  As a result, the due process concerns Defendants raise are unwarranted.  *See* Motion to Answer at ¶ 5.[2]

For all of the above reasons, Defendants' Motion to Answer should be denied.

**Motion for Entry of Default**

Defendants ask the Court to deny plaintiff's Motion for Entry of Default arguing that plaintiff will not suffer any prejudice by allowing the Answer to be filed late and that it would be unfair for the Court to use its default judgment powers to prevent resolution of this dispute on the merits.  Motion to Answer at ¶ 5.  Defendants ignore the straightforward requirement that "[w]hen a party fails to file an answer, or otherwise plead or defend, within the time period required by Rule 12 of the Federal Rules of Civil Procedure, the clerk 'shall enter the party's default.' Fed. R. Civ. Pro. 55(a)." *Honda Power Equipment Manufacturing, Inc. v. Woodhouse*,

---

[2] Defendants would also have the opportunity to move under Rule 55(c) to set aside an entry of default before a final judgment was entered.

4

219 F.R.D. 2, 4 (D.D.C. 2003) (citations omitted). Even the authority cited by Defendants recognizes the court has the discretion to order the entry of default. *Jackson v. Beech*, 636 F.2d 831, 835 (D.C. Cir. 1980)(*cited* by Defendants)("[o]nce a defendant fails to file a responsive answer, he is in default, and an entry of default may be made by either the clerk or the judge."); *see also United States v. DiMucci*, 879 F.2d 1488, 1490-91 (7th Cir. 1989)(affirming trial court's entry of default and later default judgment in a Fair Housing Act case).

Plaintiff need not demonstrate, as Defendants suggest, prejudice or a balance of the equities in its favor to obtain an entry of default. Only the first of these factors is even considered when a defendant is moving to set aside a default judgment under Rule 60(b), *Jackson,* 636 F.2d at 836; neither is considered with respect to entry of default.[3] Nor does the court in *Jackson* suggest otherwise. In *Jackson,* the appellate court granted a motion under Rule 60(b) by the defendants to set aside a default judgment only *after* a full hearing by the trial court below and an appeal. Here, there has been no hearing, default judgment or appeal; therefore, the Rule 60(b) standard does not apply. The only test for entry of default under Rule 55(a) is whether the Defendants failed to timely file a responsive answer. *Honda*, 219 F.R.D. at 4. Because Defendants did not

---

[3] Although not required to demonstrate prejudice for entry of default, plaintiff has been prejudiced by the delay caused by Defendants' untimely answer because of Defendants' deteriorating financial conditions.

timely file, the Court should grant Plaintiff's Motion for Entry of Default and direct the Clerk to enter a default.

Dated:  May 1, 2008

                                      Respectfully submitted,

                                       _/s/  Bradley H. Blower_____
                                      John P. Relman (Bar No. 405500)
                                      Bradley H. Blower (Bar No. 421112)
                                      Glenn Schlactus (Bar No. 475950)

                                      RELMAN & DANE, PLLC
                                      1225 19th Street NW, Suite 600
                                      Washington, DC 20036
                                      (202) 728-1888

                                      *Attorneys for Plaintiff*

# ATTACHMENT A

*This is an EDGAR HTML document rendered as filed.  [ Alternative Formats ]*

---

Form 10-K

Table of Contents

---

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

---

# FORM 10-K

---

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the Fiscal Year Ended <u>December 31, 2007</u>

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the Transition Period From _____ to _____

Commission File Number <u>001-13533</u>

---

# NOVASTAR FINANCIAL, INC.
(Exact Name of Registrant as Specified in its Charter)

---

| | |
|---|---|
| <u>Maryland</u> | 74-2830661 |
| (State or Other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification No.) |
| 8140 Ward Parkway, Suite 300, Kansas City, MO | 64114 |
| (Address of Principal Executive Office) | (Zip Code) |

Registrant's Telephone Number, Including Area Code: (<u>816</u>) 237-7000

---

Securities Registered Pursuant to Section 12(b) of the Act:

None

Securities Registered Pursuant to Section 12(g) of the Act:

Title of Each Class
Common Stock, $0.01 par value
Redeemable Preferred Stock

---

Indicate by check mark if <u>the registrant</u> is a well-known seasoned issuer, as defined by Rule 405 of the Securities

Table of Contents

*Hedging.* We use derivative instruments, including interest rate swap and cap contracts, to mitigate the risk of our cost of funding increasing at a faster rate than the interest on assets. We adhere to an interest rate risk management program that is approved by our Board. This program is formulated with the intent to mitigate the potential adverse effects resulting from rate adjustment limitations on mortgage assets and the differences between interest rate adjustment indices and interest rate adjustment periods of adjustable-rate mortgage loans and related borrowings. However, our hedging strategy is subject to, and is currently limited by, considerations of cost and liquidity risk.

Interest rate cap and swap agreements are legal contracts between us and a third-party firm or *"counterparty"*. Under an interest rate cap agreement the counterparty agrees to make payments to us in the future should the one-month LIBOR interest rate rise above the strike rate specified in the contract. We make either quarterly or monthly premium payments or have chosen to pay the premiums at the beginning to the counterparties under contract. Each contract has either a fixed or amortizing notional face amount on which the interest is computed, and a set term to maturity. When the referenced LIBOR interest rate rises above the contractual strike rate, we earn cap income. Under interest rate swap agreements we pay a fixed rate of interest while receiving a rate that adjusts with one-month LIBOR.

The following table summarizes the key contractual terms associated with our interest rate risk management contracts as of December 31, 2007, all of which are held by securitization trusts. All of our pay-fixed swap contracts and interest rate cap contracts are indexed to one-month LIBOR. During 2007, we terminated all of our derivative instruments not in securitization trusts. The cash impact was minimal to settle the terminations.

We have determined the following estimated net fair value amounts by using available market information and valuation methodologies we deem appropriate as of December 31, 2007.

**Interest Rate Risk Management Contracts**
(dollars in thousands)

| | Net Fair Value | Total Notional Amount | Maturity Range | | | | |
|---|---|---|---|---|---|---|---|
| | | | 2007 | 2008 | 2009 | 2010 | 2011 and beyond |
| Pay-fixed swaps: | | | | | | | |
|    Contractual maturity | $(9,441) | $1,165,000 | $720,000 | $405,000 | $40,000 | $— | $— |
|    Weighted average pay rate | | 4.9% | 5.0% | 4.9% | 5.0% | — | — |
|    Weighted average receive rate | | 4.6% | (A) | (A) | (A) | (A) | — |
| Interest rate caps: | | | | | | | |
|    Contractual maturity | $ 85 | $ 220,000 | $180,000 | $ 40,000 | $ — | $— | $ — |
|    Weighted average strike rate | | 5.0% | 5.0% | 5.0% | — | — | — |

(A) The pay-fixed swaps receive rate is indexed to one-month LIBOR.

*Liquidity Risk.* A significant risk to our operations is the risk that we will not have enough cash and liquidity available to operate our business and meet our debt payment and other obligations. We currently face substantial liquidity risk and uncertainty, near-term and otherwise, which threatens our ability to continue as a going concern and avoid bankruptcy. See the *"Liquidity and Capital Resources"* section of *"Management's Discussion and Analysis of Financial Condition and Results of Operations"* for further discussion of liquidity risks and resources available to us.

*Credit Risk.* Credit risk is the risk that we will not fully collect the principal we have invested in mortgage loans or the amount we have invested in securities. Nonconforming mortgage loans comprise substantially all of our mortgage loan portfolio and serve as collateral for our mortgage securities. Nonconforming borrowers include individuals who do not qualify for agency/conventional lending programs because of a lack of conventional documentation or previous credit difficulties. Often, they are individuals or families who have built up high-rate consumer debt and are attempting to use the equity in their home to consolidate debt and reduce the amount of money it takes to service their monthly debt obligations.

5

Table of Contents

*There can be no assurance that we will have access to financing necessary to support our business and assets. Further, if we are unable to remain in compliance with agreements governing our indebtedness or to obtain waivers of any noncompliance, we will not be able to continue as a going concern.*

We have incurred significant debt to finance our past operations, including the origination and purchase of mortgage loans and the purchase of mortgage securities. A significant amount of our indebtedness is represented by multiple secured financing facilities with Wachovia and the junior subordinated debentures related to the trust preferred securities of NovaStar Capital Trust I and NovaStar Capital Trust II.

We currently intend to use available cash inflows in excess of our immediate operating needs, including debt service payments, to repay all of Wachovia's outstanding borrowings and any remaining fees due under the repurchase agreements at the earliest practical date. During and after this period of repayment, any new advances under the Wachovia lending facilities are at Wachovia's sole discretion and we do not expect any such advances to be made.

As of December 31, 2007 and thereafter, we are out of compliance with the net worth and liquidity covenants in our financing agreements with Wachovia. While Wachovia has waived this non compliance through April 30, 2008, there can be no assurance that we will be able to obtain further waivers of, or amendments to, our financing facilities if we were to breach any representation, warranty or covenant contained in such financing facilities or waiver or amendment. In addition, we project that we will be out of compliance with our current waiver prior to its expiration of April 30, 2008. Any default under our secured financing facilities and failure to obtain any necessary waivers or amendments in the future could result in the acceleration of the indebtedness under these facilities and the liquidation by the lender of the related collateral. Any acceleration of indebtedness would have a material adverse affect on our liquidity and ability to continue as a going concern and any liquidation of our collateral could be at a substantial loss.

Our wholly owned subsidiary NovaStar Mortgage, Inc. has outstanding junior subordinated debentures related to the outstanding trust preferred securities of NovaStar Capital Trust I and NovaStar Capital Trust II. We have guaranteed NovaStar Mortgage's obligations under these debentures, including NovaStar Mortgage's obligations to make periodic interest payments thereon. Our financing facilities with Wachovia prohibit us from making any such payments without Wachovia's consent in the event that we have less than $30 million of available liquidity. In the event that any such payments are not made when due, whether as a result of the restrictions in our financing agreements with Wachovia or otherwise, or we or NovaStar Mortgage otherwise breach any of our obligations relating to the debentures or trust preferred securities and fail to remedy the default within the applicable cure period, if any, all of our obligations with respect thereto, including the repayment of principal, may be accelerated and declared to be immediately due and payable, in which case we would be forced to seek the protection of applicable federal and state bankruptcy laws.

In light of current market conditions, our current financial condition, and our lack of significant unencumbered assets, no assurance can be given regarding our ability to meet our debt service obligations or to secure additional financing. To the extent we are unable to meet our debt service obligations or do not have access to adequate financing, our business prospects and ability to continue as a going concern will be negatively affected. There is no assurance that we will continue to have access to financing at levels necessary for operations or other liquidity needs or that we will not be forced to file for bankruptcy.

*Various legal proceedings could adversely affect our financial condition, our results of operations, liquidity and our ability to continue as a going concern.*

In the course of our business, we are subject to various legal proceedings and claims. See Part I *"Item 3—Legal Proceedings."* The resolution of these legal matters or other legal matters could result in a material adverse impact on our results of operations, liquidity, financial condition and ability to continue as a going concern.

The Securities and Exchange Commission (the *"Commission"*) has requested information from issuers in our industry, including us, regarding accounting for mortgage loans and other mortgage related assets. In addition, we have received requests or subpoenas for information relating to our operations from various federal and state regulators and law enforcement, including, without limitation, the Federal Trade Commission, the Department of Housing and Urban Development, the United States Department of Justice, the Federal Bureau of Investigation, the New York Attorney General and the Department of Labor. While we have provided, or are in the process of providing, the requested information to the applicable officials, we may be subject to further information requests from, or action by, these or other regulators or law enforcement officials. To the extent we are subject to any actions, our financial condition, liquidity, and ability to continue a going concern could be materially adversely affected.

*There can be no assurance that our common stock or Series C Preferred Stock will continue to be traded in an active*

*market.*

Our common stock and our 8.90% Series C Preferred Stock were delisted by the New York Stock Exchange (*"NYSE"*) in January 2008, as a result of failure to meet applicable standards for continued listing on the NYSE. Our common stock and Series C Preferred Stock are currently quoted on the OTC Bulletin Board and on the Pink Sheets. However, there can be no assurance that an active trading market will be maintained. Trading of securities on the OTC and Pink Sheets is generally limited and is effected on a less regular basis than on exchanges, such as the NYSE, and accordingly investors who own or purchase our stock will find that the

9

Table of Contents

preferred securities require quarterly interest payments. The interest rates are floating at the three-month LIBOR rate plus 3.5% and reset quarterly. The trust preferred securities are redeemable, at NCTI and NCTII's option, in whole or in part, anytime without penalty on or after March 15, 2010 and June 30, 2011, respectively, but are mandatorily redeemable when they mature on March 15, 2035 and June 30, 2036, respectively. If they are redeemed prior to maturity, the redemption price will be 100% of the principal amount plus accrued and unpaid interest.

The proceeds from the issuance of the trust preferred securities and the common securities of NCTI and NCTII were loaned to NMI in exchange for $51.6 million and $36.1 million, respectively, of junior subordinated debentures of NMI, which are the sole assets of NCTI and NCTII, respectively. The terms of the junior subordinated debentures match the terms of the trust preferred securities. The debentures are subordinate and junior in right of payment to all present and future senior indebtedness and certain other financial obligations of the Company. The Company entered into a guarantee for the purpose of guaranteeing the payment of any amounts to be paid by NMI under the terms of the debentures. The Company may not declare or pay any dividends or distributions on, or redeem, purchase, acquire or make a liquidation payment with respect to any of its capital stock if there has occurred and is continuing an event of default under the guarantee. Following payment by the Company of offering costs, the Company's net proceeds from the NCTI and NCTII offerings aggregated $48.4 million and $33.9 million, respectively.

The assets and liabilities of NCTI and NCTII are not consolidated into the consolidated financial statements of the Company. Accordingly, the Company's equity interests in NCTI and NCTII are accounted for using the equity method. Interest on the junior subordinated debt is included in the Company's consolidated statements of income as interest expense—subordinated debt and the junior subordinated debentures are presented as a separate category on the consolidated balance sheets.

### Note 8. Commitments and Contingencies

***Commitments.*** The Company leases office space under various operating lease agreements. Rent expense for 2007, 2006 and 2005, under leases related to continuing operations, aggregated $3.9 million, $3.8 million and $4.0 million, respectively. At December 31, 2007, future minimum lease commitments under those leases are as follows (dollars in thousands):

|  | Lease Obligations |
|---|---|
| 2008 | $ 4,265 |
| 2009 | 4,265 |
| 2010 | 4,265 |
| 2011 | 355 |
| 2012 | — |
| Thereafter | — |

The Company has entered into various lease agreements pursuant to which the lessor agreed to repay the Company for certain existing lease obligations. The Company has recorded deferred lease incentives related to these payments which will be amortized into rent expense over the life of the respective lease on a straight-line basis. Deferred lease incentives related to continuing operations as of December 31, 2007 and 2006 were $0.9 million and $1.2 million, respectively.

The Company has also entered into a sublease agreement during 2007 for office space formerly occupied by the Company. The Company received approximately $44,000 in 2007 under this agreement.

***Contingencies***

**American Interbanc Mortgage Litigation**. On March 17, 2008, the Company and American Interbanc Mortgage, LLC (*"Plaintiff"*) entered into a Confidential Settlement Term Sheet Agreement (the *"Settlement Terms"*) with respect to the actions, judgments and claims described below.

In March 2002, Plaintiff filed an action against NHMI in Superior Court of Orange County, California entitled American Interbanc Mortgage LLC v. NovaStar Home Mortgage, Inc. et. al. (the *"California Action"*). In the California Action, Plaintiff alleged that NHMI and two other mortgage companies (*"Defendants"*) engaged in false advertising and unfair competition under certain California statutes and interfered intentionally with Plaintiff's prospective economic relations. On May 4, 2007, a jury returned a verdict by a 9-3 vote awarding Plaintiff $15.9 million. The court trebled the award, made adjustments for amounts paid by settling Defendants, and entered a $46.1 million judgment against Defendants on

June 27, 2007. The award is joint and several against the Defendants, including NHMI. It is unknown if the other two Defendants, one of which has filed a bankruptcy petition, have the financial ability to pay any of the award.

85

**Table of Contents**

NHMI's motion for the trial court to overturn or reduce the verdict was denied on August 20, 2007, and NHMI appealed that decision (the *"Appeal"*). Pending the Appeal, Plaintiff commenced enforcement actions in the states of Missouri (the *"Kansas City Action"*) and Delaware, and obtained an enforcement judgment in Delaware (the *"Delaware Judgment"*). On January 23, 2008, Plaintiff filed an involuntary petition for bankruptcy against NHMI under 11 U.S.C. Sec. 303, in the United States Bankruptcy Court for the Western District of Missouri (the *"Involuntary"*). Plaintiff was joined by two individuals alleging claims totaling $150 in the Involuntary filing. NHMI filed an answer and contested the standing of Plaintiff and the individuals to be petitioning creditors in bankruptcy.

On March 17, 2008, the Company and Plaintiff entered into the Settlement Terms with respect to the California Action, the Judgment, the Kansas City Action, the Delaware Judgment, the Involuntary, and all related claims.

Under the Settlement Terms, the parties agreed to move to dismiss the Involuntary. Within ten (10) business days after notice of entry of the dismissal of the Involuntary, the Company will pay Plaintiff $2,000,000 plus the balance in an account established by order of the Bankruptcy Court in an amount no less than $50,000, with NHMI obligated to otherwise satisfy obligations to its identified creditors up to $48,000. The parties also agreed to extend the Appeal briefing period pending finalization of the settlement of the other actions, judgments and claims, as described below.

The Settlement Terms provide that, subject to payment of the amounts described above and satisfaction of certain other conditions, the parties will dismiss the California Action as to NHMI and the Kansas City Action and Delaware Judgment, effect notice of satisfaction of the Judgment, and effect a mutual release of all claims that were or could have been raised in any of the foregoing or that are related to the subject matter thereof, upon the earliest of the following: (i) July 1, 2010, (ii) a waiver by Wachovia of Wachovia's right to file an involuntary bankruptcy proceeding against any of the NovaStar Entities prior to July 1, 2010, (iii) an extension of the maturity date of the Company's indebtedness to Wachovia until at least July 1, 2010, or (iv) delivery to Plaintiff of written documentation evidencing the full satisfaction of the Company's current indebtedness to Wachovia.

In addition to the initial payments to be made to the Plaintiff following dismissal of the Involuntary, the Company will pay Plaintiff $5.5 million if, prior to July 1, 2010, (i) NFI's average common stock market capitalization is at least $94.4 million over a period of five (5) consecutive business days, or (ii) the holders of NFI's common stock are paid $94.4 million in net asset value as a result of any sale of NFI or its assets. If NFI is sold prior to July 1, 2010 for less than $94.4 million and ceases to be a public company, then NFI will obligate the purchaser either to immediately pay $2 million to Plaintiff, or to pay Plaintiff $5.5 million in the event the value of the company exceeds $94.4 million prior to July 1, 2010 as determined by an independent valuation company.

In accordance with generally accepted accounting principles, NHMI has recorded a liability of $47.1 million as of December 31, 2007 with a corresponding charge to earnings. The $47.1 million includes interest which is accruing on the obligation. Because NHMI is a wholly owned indirect subsidiary of the Company, the $47.1 million liability is included in the consolidated financial statements of the Company. The liability is included in the *"Liabilities of discontinued operations"* line of the consolidated balance sheets while the charge to earnings is included in the *"(Loss) income from discontinued operations, net of income tax"* line of the consolidated statements of operations.

**Other Litigation.** Since April 2004, a number of substantially similar class action lawsuits have been filed and consolidated into a single action in the United States District Court for the Western District of Missouri. The consolidated complaint names the Company and three of the Company's executive officers as defendants and generally alleges that the defendants made public statements that were misleading for failing to disclose certain regulatory and licensing matters. The plaintiffs purport to have brought this consolidated action on behalf of all persons who purchased the Company's common stock (and sellers of put options on the Company's common stock) during the period October 29, 2003 through April 8, 2004. On January 14, 2005, the Company filed a motion to dismiss this action, and on May 12, 2005, the court denied such motion. On February 8, 2007, the court certified the case as a class action. The case is now in the discovery stage. The Company believes that these claims are without merit and continues to vigorously defend against them.

In the wake of the securities class action, the Company was named as a nominal defendant in several derivative actions brought against certain of the Company's officers and directors in Missouri and Maryland. The complaints in these actions generally claimed that the defendants were liable to the Company for failing to monitor corporate affairs so as to ensure compliance with applicable state licensing and regulatory requirements. The parties reached a settlement of the derivative actions under which the Company agreed to adopt certain corporate governance measures and the Company's insurance carrier paid attorney's fees to plaintiffs' counsel. The settlement agreement was subject to court approval, which was granted on September 19, 2007 and has become final.

In April 2006, a single plaintiff filed a putative nationwide class action against NovaStar Mortgage in the United States District Court for the Western District of Tennessee. The complaint asserts claims under 42 U.S.C. Sections 1981 and 1982; the Fair Housing Act, 42 U.S.C. Sections 3601-3619; and the Equal Credit Opportunity Act, 15 U.S.C.

86