UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| NATIONAL COMMUNITY REINVESTMENT COALITION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 1:07-cv-00861 (RCL) |
| NOVASTAR FINANCIAL, INC., | ) ) | |
| and | ) ) | |
| NOVASTAR MORTGAGE, INC., | ) ) | |
| Defendants. | ) ) | |

**PLAINTIFF NATIONAL COMMUNITY REINVESTMENT COALITION'S MOTION FOR LEAVE TO AMEND ITS COMPLAINT TO JOIN W. LANCE ANDERSON AS A DEFENDANT**

Plaintiff National Community Reinvestment Coalition ("NCRC") respectfully moves for leave to amend its complaint pursuant to Federal Rule of Civil Procedure ("Rule") 15(a)(2) to join W. Lance Anderson as an additional defendant. Anderson is the President of the two existing defendants, NovaStar Financial, Inc. ("NFI") and its wholly-owned subsidiary NovaStar Mortgage, Inc. ("NMI") (collectively, "NovaStar"). He is also the co-founder of NFI. NMI's interrogatory responses identify Anderson as the sole person responsible for the discriminatory lending policies that NCRC challenges in this suit as violating the federal Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, as amended. Anderson is therefore properly joined as a defendant under Rule 20(a)(2).

The deadline set forth in the Scheduling Order (June 23, 2008) (Doc. 23) for amending pleadings or joining other parties is August 27, 2008. Accordingly, this motion is timely.

Plaintiff has conferred with counsel for NovaStar pursuant to Local Rule 7(m) who represented

that NovaStar intends to oppose this motion.

## NATURE OF THE CASE

NMI is, or until the recent onset of the subprime lending crisis was, one of the nation's

largest subprime lenders. *See* Compl. ¶ 11. NFI is its parent company. *See id.*; Answer of

Defs.' NFI & NMI. W. Lance Anderson is the president of both companies and the co-founder

of the parent company. *See id.* Ex. 1 (Decl. of G. Schlactus (Aug. 26, 2008)) ("Schlactus Decl.")

at Attachs. 1, 2 (Responses 2, 6, 8).

NCRC seeks relief from NovaStar's refusal to make loans secured by homes on Indian

reservations, homes used for adult foster care, and row houses in Baltimore City. *See, e.g.*,

Compl. ¶¶ 3-4. NCRC alleges that NovaStar's policies discriminate against Native Americans,

African Americans, Latinos, persons with disabilities, and persons associated with members of

these protected groups. *See, e.g., id.* ¶¶ 3-8, 18. These policies violate fair housing laws because

they intentionally discriminate and have an unnecessary and unjustified disproportionate adverse

impact. *See, e.g., id.* ¶¶ 3-8, 18, 37.

### W. LANCE ANDERSON IS PROPERLY JOINED AS A DEFENDANT BECAUSE NMI IDENTIFIED HIM IN DISCOVERY AS THE PERSON RESPONSIBLE FOR THE LENDING POLICIES CHALLENGED HEREIN

NCRC served interrogatories on NFI and NMI asking them to "[i]dentify and describe in

detail the role of all individuals responsible for NovaStar's" policies regarding making loans

secured by "properties located on Indian reservations or in Indian Country," "properties used for

adult foster care," and "row houses in Baltimore, Maryland." After stating objections, NMI

responded to each interrogatory as follows:

> Notwithstanding the foregoing objections and without waiver of the same, NMI
> responds as follows:  Lance Anderson, President of NMI and President of NFI.

2

Schlactus Decl. at Attach. 2 (Def. NMI's Responses & Objections to Pl. NCRC's First Set of Interrogatories) (Responses 2, 6, 8). No other persons were identified.[1]

In light of this information, Anderson may properly be joined as a defendant under Rule 20. Rule 20(a)(2) states that:

> [p]ersons . . . may be joined in one action as defendants if:
>
> (A) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and
>
> (B) any question of law or fact common to all defendants will arise in the action.

Joining Anderson satisfies the rule. Part (A) is satisfied because NCRC seeks to hold NFI, NMI, and Anderson liable for the same lending policies. Part (B) is satisfied because common factual and legal questions will arise regarding the nature of the policies; the discriminatory effect of the policies on Native Americans, African Americans, Latinos, persons with disabilities, and persons associated with members of these protected groups; and the discriminatory intent motivating the policies.

Amendment is likewise proper under Rule 15, pursuant to which leave to amend should be "freely given" in the interests of justice.

---

[1] NFI refused to answer parallel interrogatories. Plaintiff is pursuing its meet and confer obligations with NFI with respect to this refusal, and hopes to resolve the matter without the need to file a motion to compel.

## CONCLUSION

For the reasons stated above, Plaintiff NCRC respectfully submits that it should be granted leave to file the First Amended Complaint in the form attached hereto to as Exhibit 2, and that the proposed First Amended Complaint should be deemed filed.


Respectfully submitted,

_/s/_ Bradley_H. Blower
John P. Relman (Bar No. 405500)
Bradley H. Blower (Bar No. 421112)
Glenn Schlactus (Bar No. 475950)
RELMAN & DANE, PLLC
1225 19th Street NW, Suite 600
Washington, DC 20036
(202) 728-1888
(202) 728-0848 (fax)
jrelman@relmanlaw.com
bblower@relmanlaw.com
gschlactus@relmanlaw.com

*Attorneys for Plaintiff*

Dated:  August 27, 2008

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of Plaintiff National Community Reinvestment Coalition's Motion for Leave to Amend its Complaint to Join W. Lance Anderson as a Defendant was sent via ECF on August 27, 2008, to the following:

> Mitchel H. Kider
> David M. Souders
> Brian P. Perryman
> WEINER BRODSKY SIDMAN KIDER PC
> 1300 Nineteenth Street NW
> Fifth Floor
> Washington DC 20036-1609
> kider@wbsk.com
> souders@wbsk.com
> perryman@wbsk.com
>
> Counsel for the Defendants

Caitlin Parton
Paralegal

5

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL COMMUNITY REINVESTMENT COALITION, )<br><br>Plaintiff, )<br><br>v. )<br><br>NOVASTAR FINANCIAL, INC., )<br><br>and )<br><br>NOVASTAR MORTGAGE, INC., )<br><br>Defendants. ) | Case No. 1:07-cv-00861 (RCL) |

**[PROPOSED] ORDER**

Plaintiff National Community Reinvestment Coalition having filed a Motion for Leave to Amend Its Complaint to Join W. Lance Anderson as a Defendant, the Court having considered the pleadings filed in support and in opposition thereto, and there appearing good cause therefore, the Motion to Amend the Complaint is GRANTED, and:

IT IS HEREBY ORDERED that:

Plaintiff is granted leave to file the First Amended Complaint; and

The First Amended Complaint, as attached as Exhibit 2 to the motion, is deemed filed as of this date.

SO ORDERED.

 

_____
ROYCE C. LAMBERTH
United States District Judge

DATE:  _____


Notice to:

John P. Relman
Glenn Schlactus
Relman & Associates PLLC
1225 19th St., NW, Suite 600
Washington, DC 20036
jrelman@relmanlaw.com
(202) 728-1888

Richard A. Salzman
Heller, Huron, Chertkof, Lerner, Simon & Salzman
1730 M St., NW, Suite 412
Washington, DC 20036
ras@hellerhuron.com
(202) 293-8090

*Attorneys for Plaintiff*


Daniel Albert Rezneck
Office of Corporation Counsel for the District of Columbia
441 4th Street, NW
Sixth Floor South 77
Washington, DC  20001
daniel.rezneck@dc.gov
(202) 724-5691

Carol A. Connolly
Office of Corporation Counsel for the District of Columbia
441 4th Street, NW
Washington, DC  20001
carol.connolly@dc.gov
(202) 724-6511

*Attorneys for Defendant*

# EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NATIONAL COMMUNITY REINSTATEMENT COALITION, | ) ) ) ) | |

NATIONAL COMMUNITY
REINVESTMENT COALITION,                )
                                                          )
                           Plaintiff,           )
                                                          )
           v.                                          )          Case No. 1:07-cv-00861 (RCL)
                                                          )
NOVASTAR FINANCIAL, INC.,             )
                                                          )
and                                                    )
                                                          )
NOVASTAR MORTGAGE, INC.,           )
                                                          )
                           Defendants.      )
                                                          )

## DECLARATION OF GLENN SCHLACTUS, ESQ.

I, Glenn Schlactus, hereby state as follows:

I am over the age of eighteen and am competent to make this Declaration.  I have personal knowledge of the matters set forth below.

1.        I am an attorney at the law firm of Relman & Dane, PLLC.  I represent National Community Reinvestment Coalition ("NCRC") in the above-captioned lawsuit.

I hereby declare that the following documents are attached to and filed as attachments to this Declaration:

2.        Attached hereto as Attachment 1 are true and correct copies of pages from NovaStar Financial, Inc.'s 2006 Annual Report and Proxy Statement.

1

3.      Attached hereto as Attachment 2 are true and correct copies of pages from NovaStar Mortgage, Inc.'s Responses and Objections to Plaintiff NCRC's First Set of Interrogatories, served on Plaintiff in this lawsuit.


I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.


EXECUTED WITHIN THE UNITED STATES ON:  August 26, 2008

BY:_____
        Glenn Schlactus

2

**ATTACHMENT 1**

*challenge* and change



*NovaStar Financial, Inc.*

2006 ANNUAL REPORT AND PROXY STATEMENT

## *Portfolio management*
### focuses on risk & return

The heart of our business model is a portfolio that focuses on earning risk-adjusted returns through sound financial disciplines. NovaStar's experienced asset management team pays attention to credit quality and manages risks, even as we cultivate returns to compensate investors for the risks of this asset class. An emphasis on performance of the portfolio distinguishes NovaStar from many mortgage lenders.

NovaStar's portfolio of loans under management grew 17 percent to $16.3 billion by year-end 2006, while the return on those assets fell to 1.21 percent. As we've often said, we view 1 to 1.25 percent as a "normal" rate of long-term return for this asset class, although NovaStar experienced periods of higher return in past years.

A key to our portfolio approach is hedging and mitigating risks. We focus on several factors that affect the portfolio's value, including credit risk, interest rate risk and liquidity risk. In all phases of the cycle, managing risk is the key to dealing with challenges.

For example, in addition to underwriting approaches designed to minimize credit losses, buying mortgage insurance helps protect loans against a potential drop in home prices. Approximately 56 percent of the nonprime loans we have securitized in our portfolio, excluding the 2006-MTA1 securitization, carried mortgage insurance at year-end.

Starting in 2004, we implemented innovative initiatives to mitigate delinquency risks:

- Our servicing staff was trained and mobilized to help Adjustable Rate Mortgage (ARM) customers proactively deal with the wave of interest-rate resets that began in 2006.

- Our LaunchPoint program, a team of career coaches within the servicing group, has helped more than 1,000 customers find jobs and stay on track with loans.

In 2006, our portfolio team completed seven securitizations, packaging loans into mortgage-backed securities totaling $8.6 billion.

## *Looking ahead:*
### challenge – and change

NovaStar celebrated our 10-year anniversary in 2006. Since founding the company, we have built and managed our business through easy times and hard ones for the mortgage industry. We recognize that the immediate future holds risks, particularly the need to preserve asset quality amid uncertainties in the economy and housing market.

Our plans for 2007 anticipate the need for change, based on applying financial disciplines to maximize shareholder value in a challenging time. Some developments will be opportunistic, but you will likely hear more about these initiatives already underway:

- Our efforts to enhance credit quality and loan performance.

- A continued emphasis on controlling costs.

- Further development of our retail lending division.

NovaStar's people have been the key to our successes over the past 10 years. Energized by vibrant core values and proven skills in mortgage finance, our colleagues in all areas of the company also are contributing to our direction for the future. We want to offer a hearty "thank you" to all of our employees.

We also appreciate your involvement as a shareholder. We look forward to discussing future results through what we expect to be a challenging, volatile market.

Scott Hartman
Chairman and CEO

Lance Anderson
President and COO

## *Board of Directors*



**SCOTT HARTMAN**
Chairman of the Board
Chief Executive Officer



**LANCE ANDERSON**
President
Chief Operating Officer



**GREG BARMORE**
Chairman of the
Compensation Committee



**DONALD M. BERMAN**
Director



**ART BURTSCHER**
Chairman of the
Nominating/Corporate
Governance Committee



**EDWARD MEHRER**
Chairman of the
Audit Committee

**Nominees and Directors**

*Class I Directors – Terms Expiring 2009*

       **Art N. Burtscher,** age 56, has been a member of the Board of Directors since 2001.  In 2000, Mr. Burtscher became Chairman of McCarthy Group Advisors, LLC, an Omaha, Nebraska asset management organization. From 1988 to 2000, Mr. Burtscher served as President and Chief Executive Officer of Great Western Bank in Omaha, Nebraska.  Mr. Burtscher also serves on the Board of Directors of Great Western Bancorporation, Inc., an Omaha, Nebraska multi-bank holding company, and NIC Inc., an Overland Park, Kansas eGovernment service provider.

       **Edward W. Mehrer,** age 68, has been a member of the Board of Directors since 1996.  From November 2002 through June 2003, he served as Interim President & Chief Executive Officer of Cydex, a pharmaceutical company based in Overland Park, Kansas.  From 1996 through December 2003, he served as Chief Financial Officer of Cydex.  For approximately ten years and until December 1995, Mr. Mehrer was associated with Hoechst Marion Roussel, formerly Marion Merrell Dow, Inc., an international pharmaceutical company (Marion).  From December 1991 to December 1995, he served as Executive Vice President and Chief Financial Officer and a director of Marion.  Prior to joining Marion, Mr. Mehrer was a partner with the public accounting firm of Peat, Marwick, Mitchell & Co., a predecessor firm to KPMG LLP, in Kansas City, Missouri.  Mr. Mehrer also serves on the Board of Directors of FBL Financial Group, Inc., a Des Moines, Iowa insurance company and MGI Pharma Inc., a Bloomington, Minnesota biopharmaceutical company.

*Class II Nominees – Terms Expiring 2010*

       **W. Lance Anderson,** age 46, is a co-founder, President and Chief Operating Officer of NovaStar Financial, and has been a member of the Board of Directors since 1996.  His primary responsibilities include directing the mortgage origination and servicing operations along with the non-financial support areas of human resources, information systems and legal.  Prior to joining NovaStar, Mr. Anderson served as Executive Vice President of Dynex Capital, Inc., formerly Resource Mortgage Capital, Inc., a New York Stock Exchange listed real estate investment trust (Dynex).  In addition, Mr. Anderson was President and Chief Executive Officer of Dynex's single-family mortgage operation, Saxon Mortgage.  Prior to joining NovaStar Financial, he had been at Dynex since October 1989.

       **Gregory T. Barmore,** age 65, has served on the Board of Directors since 1996.  He retired as Chairman of the Board of GE Capital Mortgage Corporation (GECMC), a subsidiary of General Electric Capital Corporation (GE Capital) headquartered in Raleigh, North Carolina in 1997.  He was responsible for overseeing the strategic development of GECMC's residential real estate-affiliated financial business, including mortgage insurance, mortgage services and mortgage funding.  Prior to joining GECMC in 1986, Mr. Barmore was Chief Financial Officer of Employers Reinsurance Corporation (ERC), one of the nation's largest property and casualty reinsurance companies and also a subsidiary of GE Capital.  Mr. Barmore also serves as Chairman of the Board of Directors of ICO, Inc., a Houston, Texas based plastics products company.

*Class III Directors – Terms Expiring 2008*

       **Scott F. Hartman,** age 47, is a co-founder, Chairman of the Board and Chief Executive Officer of NovaStar Financial, and has been a member of the Board of Directors since 1996.  His primary responsibilities are to interact with the capital markets and oversee the portfolio of investments and the securitization of mortgage loan production.  Mr. Hartman served from February 1995 to June 1996 as Executive Vice President of Dynex.  His responsibilities while at Dynex included managing a $4 billion investment portfolio, overseeing the securitization of mortgage loans originated through Dynex's mortgage operation and the administration of the securities issued by Dynex.

       **Donald M. Berman,** age 55, was named to the Board of Directors in July of 2005.  Since 1987 Mr. Berman has been the Chairman and Chief Executive Officer of CardWorks, L.P., a privately held consumer finance company based in Woodbury, New York.  As Chief Executive Officer of CardWorks, Mr. Berman oversees two wholly owned subsidiaries: Cardholder Management Services, Inc. (CMS), based in Woodbury, New York, which was founded by Mr. Berman in 1987, and Merrick Bank, located in Salt Lake City, Utah, which was established by CMS in 1997.  Mr. Berman has been a senior marketing executive with Eastern States Bankcard Association, a bankcard industry consultant and a Vice President in the Financial Institutions Division of Smith Barney.

**ATTACHMENT 2**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL COMMUNITY REINVESTMENT COALITION, ) ) ) Plaintiff, ) ) v. ) ) NOVASTAR FINANCIAL, INC. ) ) and ) ) NOVASTAR MORTGAGE, INC., ) ) Defendants. ) | Civil Action No. 1:07-cv-00861-RCL |

## DEFENDANT NOVASTAR MORTGAGE, INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFF NATIONAL COMMUNITY REINVESTMENT COALITION'S FIRST SET OF INTERROGATORIES

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Defendant NovaStar

Mortgage, Inc. ("NMI"), hereby provides the following responses to the First Set of

Interrogatories ("Interrogatories") propounded by Plaintiff National Community Reinvestment

Coalition ("NCRC") as follows:

## GENERAL RESPONSE AND OBJECTIONS

NMI makes the following General Response and Objections (hereinafter referred to

collectively as "General Response") to NCRC's Interrogatories. The objections in the General

Response apply to so many of the Interrogatories that, for convenience, they are set forth

immediately below and are not necessarily repeated after each Interrogatory to which an

objection is asserted. The assertion of the same, similar, or additional objections in the

including a requirement that the lender must endeavor to sell trust land to a Native American buyer.

- HUD may reject assignments of defaulted mortgages if HUD determines that assignment is not in HUD's "best interest."
- Lender must establish a system for management review of loans to assure that appropriate decisions are made before submitting the defaulted mortgage to HUD for assignment.
- Lender must submit extensive documentation to HUD to qualify for an assignment of a defaulted mortgage.

## INTERROGATORY NO. 2:

Identify and describe in detail the role of all individuals responsible for NovaStar's policy described in response to Interrogatory No. 1.

## RESPONSE TO INTERROGATORY NO. 2:

NMI objects to this Interrogatory on the grounds that it is vague and ambiguous as to the terms "responsible for" and "NovaStar's policy described in response to Interrogatory No. 1" as used in this context. NMI further objects to this Request in that Plaintiff collectively defines NMI and NFI as "NovaStar" and addresses the Requests to "NovaStar" in such a manner as to imply that they are basically one entity with joint policies, practices and/or procedures when the contrary is true.

Notwithstanding the foregoing objections and without waiver of the same, NMI responds as follows: Lance Anderson, President of NMI and President of NFI.

## INTERROGATORY NO. 3:

Identify and describe in detail the role of all individuals involved in any decision by NovaStar to participate or not to participate in the Section 184 Indian Home Loan Guarantee Program.

## RESPONSE TO INTERROGATORY NO. 3:

9

NMI objects to this Interrogatory on the grounds that it is vague and ambiguous as to the terms "involved" and "any decision by NovaStar to participate or not to participate" as used in this context. NMI further objects to this Request in that Plaintiff collectively defines NMI and NFI as "NovaStar" and addresses the Requests to "NovaStar" in such a manner as to imply that they are basically one entity with joint policies, practices and/or procedures when the contrary is true.

Notwithstanding the foregoing objections and without waiver of the same, NMI responds as follows: Lance Anderson, as President of NMI, was the individual with ultimate responsibility as to whether NMI would, or would not, participate in the Section 184 Indian Home Loan Guarantee Program; however, NMI is not aware of any specific discussions or decisions made by NMI as to whether it should participate in the Section 184 Indian Home Loan Guarantee Program.

**INTERROGATORY NO. 4:**

Identify and describe in detail the responsibilities of all individuals who at any time have had responsibilities on behalf of NovaStar related to the Section 184 Indian Home Loan Guarantee Program.

**RESPONSE TO INTERROGATORY NO. 4:**

NMI objects to this Interrogatory on the grounds that it is vague and ambiguous as to the terms "responsibilities on behalf of NovaStar" as used in this context. NMI further objects to this Request in that Plaintiff collectively defines NMI and NFI as "NovaStar" and addresses the Requests to "NovaStar" in such a manner as to imply that they are basically one entity with joint policies, practices and/or procedures when the contrary is true.

Notwithstanding the foregoing objections and without waiver of the same, NMI responds as follows:  See Response to Interrogatory No. 3.

**INTERROGATORY NO. 5:**

Provide a detailed explanation of and state the reason(s) for NovaStar's policy regarding making loans secured by properties used for adult foster care.

**RESPONSE TO INTERROGATORY NO. 5:**

NMI objects to this Interrogatory on the grounds that it is vague and ambiguous as to the terms "NovaStar's policy regarding making loans secured by properties used for adult foster care" as used in this context.  NMI further objects to the extent that this Interrogatory seeks information protected by the attorney-client privilege and/or work product doctrine.  NMI further objects to this Interrogatory on the grounds that it seeks to invade NMI's confidential and proprietary information.  NMI further objects to this Request in that Plaintiff collectively defines NMI and NFI as "NovaStar" and addresses the Requests to "NovaStar" in such a manner as to imply that they are basically one entity with joint policies, practices and/or procedures when the contrary is true.

Notwithstanding the foregoing objections and without waiver of the same, NMI responds as follows:  Adult foster care facilities have either a commercial use or a mix of commercial and residential uses.  Regardless, NMI's policy – as explained in Section 5 of the Program Manual produced in response to Plaintiff's First Set of Requests for Production of Documents to NMI – is to not make loans on *any* properties with either a commercial use or a mix of commercial and residential uses.  The specific policy regarding loans secured by adult foster care facilities is simply an extension of this more general policy.  There are significant differences between

11

lending on residential properties and commercial properties. NMI's business model focuses on single-family residential properties.

**INTERROGATORY NO. 6:**

Identify and describe in detail the role of all individuals responsible for NovaStar's policy described in response to Interrogatory No.5.

**RESPONSE TO INTERROGATORY NO. 6:**

NMI objects to this Interrogatory on the grounds that it is vague and ambiguous as to the terms "responsible for" and "NovaStar's policy described in response to Interrogatory No. 5" as used in this context. NMI further objects to this Request in that Plaintiff collectively defines NMI and NFI as "NovaStar" and addresses the Requests to "NovaStar" in such a manner as to imply that they are basically one entity with joint policies, practices and/or procedures when the contrary is true.

Notwithstanding the foregoing objections and without waiver of the same, NMI responds as follows: Lance Anderson, President of NMI and President of NFI.

**INTERROGATORY NO. 7:**

Provide a detailed explanation of and state the reason(s) for NovaStar's policy regarding making loans secured by row houses located in Baltimore, Maryland.

**RESPONSE TO INTERROGATORY NO. 7:**

NMI objects to this Interrogatory on the grounds that it is vague and ambiguous as to the terms "NovaStar's policy regarding making loans secured by row houses located in Baltimore, Maryland" as used in this context. NMI further objects to the extent that this Interrogatory seeks information protected by the attorney-client privilege and/or work product doctrine. NMI further objects to this Interrogatory on the grounds that it seeks to invade NMI's confidential and

12

proprietary information. NMI further objects to this Request in that Plaintiff collectively defines NMI and NFI as "NovaStar" and addresses the Requests to "NovaStar" in such a manner as to imply that they are basically one entity with joint policies, practices and/or procedures when the contrary is true.

Notwithstanding the foregoing objections and without waiver of the same, NMI responds as follows: NMI has been willing to make loans on row houses in Baltimore prior to January 2005 and since August 2006. In any event, prior to August 2006, there were legitimate, non-discriminatory reasons for not making loans secured by Baltimore row houses, particularly the substantial fraud associated with the flipping of such properties that is well known to the mortgage industry. It is well known in the lending industry that Baltimore row houses have been involved in property flipping schemes that have injured consumers and lenders alike. While the schemes may have diminished, they have not been eliminated, and the effect of the schemes presents a continuing problem for lenders and secondary mortgage market investors. Reliable appraisals on row houses are difficult, and in most cases impossible, to obtain because the massive amount of property flipping involving such houses creates substantial doubt as to the validity of any comparable property value, as well as the chain of title.

Indeed, problems created by the schemes were recognized by HUD, which took action to protect the Federal Housing Administration ("FHA") loan program. Specifically, losses experienced by the FHA as a result of insured loans on properties involved in property flipping schemes caused HUD to propose and then adopt a rule on FHA loans specifically aimed at property flipping. The rule prohibits FHA financing on property to be sold less than 90 days after the property was acquired by the seller, and imposes restrictions on transactions in which

the property will be sold soon, but not less than 90 days, after the property was acquired by the seller.

In short, the policy of not lending on Baltimore row houses reflects the substantial concerns of, and risks to, the mortgage industry of the harm that results from property flipping.

**INTERROGATORY NO. 8**:

Identify and describe in detail the role of all individuals responsible for NovaStar's policy described in response to Interrogatory No.7.

**RESPONSE TO INTERROGATORY NO. 8:**

NMI objects to this Interrogatory on the grounds that it is vague and ambiguous as to the terms "responsible for" and "NovaStar's policy described in response to Interrogatory No. 7" as used in this context. NMI further objects to this Request in that Plaintiff collectively defines NMI and NFI as "NovaStar" and addresses the Requests to "NovaStar" in such a manner as to imply that they are basically one entity with joint policies, practices and/or procedures when the contrary is true.

Notwithstanding the foregoing objections and without waiver of the same, NMI responds as follows:  Lance Anderson, President of NMI and President of NFI.

**INTERROGATORY NO. 9:**

Identify all persons who are officers, directors, and/or employees of both NovaStar Financial and NovaStar Mortgage.

**RESPONSE TO INTERROGATORY NO. 9:**

NMI objects to this Interrogatory on the grounds that it is impermissibly compound.

# EXHIBIT 2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **NATIONAL COMMUNITY** | ) | |
| **REINVESTMENT COALITION,** | ) | |
| 727 15th Street, N.W. | ) | |
| Suite 900 | ) | |
| Washington, D.C. 20005 | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:07-cv-00861 (RCL) |
| | ) | |
| **NOVASTAR FINANCIAL INC.,** | ) | |
| 300 East Lombard Street | ) | |
| Baltimore, Maryland 21202 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **NOVASTAR MORTGAGE INC.,** | ) | |
| 8699 Butterfield Avenue | ) | |
| Richmond, Virginia 23229 | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

### NATURE OF THE ACTION

1.      This Complaint brought by the National Community Reinvestment Coalition (the "NCRC" or "Plaintiff") arises out of discriminatory lending policies and practices maintained by Defendants NovaStar Financial, Inc., NovaStar Mortgage, Inc. and W. Lance Anderson, the President of both companies (collectively, "NovaStar"). The NCRC seeks a declaratory judgment, preliminary and permanent injunctive relief, and damages for NovaStar's unlawful behavior. This action is brought under the Fair Housing Act of 1968, as amended, 42 U.S.C. § 3601 *et seq.* (the "FHA").

2.      Plaintiff NCRC is a national non-profit organization with the mission and purpose of increasing fair and equal access to credit, capital, and banking services and products for all Americans, regardless of race, national origin, or disability.  NovaStar's discriminatory policies and practices have frustrated the NCRC's mission of increasing the flow of private capital into underserved communities, and have caused the NCRC to expend its scarce resources on educational programs, investigations, and litigation to identify and combat such practices.

3.      NovaStar maintains and publishes two lending eligibility policies that discriminate purposefully and intentionally against Native Americans and people with disabilities.  Specifically, NovaStar's underwriting guidelines and policies treat "Properties located on Indian reservations" and "Properties for adult foster care" as "Unacceptable" for its lending business.  *See* Excerpts of Program Manual at p. 40, attached at Exh. A.  These facially discriminatory policies explicitly treat loan applicants differently based on the protected characteristics of race, color, racial composition, national origin, and disability.  In addition, these discriminatory policies have a significant disproportionate adverse impact on Native Americans and people with disabilities.

4.      NovaStar also discriminates against African Americans and African-American homeowners, as well as persons and homeowners living in African-American neighborhoods, in the policies and practices it uses to determine eligibility for mortgage loans.  Specifically, NovaStar has a policy and practice of denying all loans for applications secured by row houses in Baltimore (hereinafter "no row house policy").  NovaStar's no row house policy has the purpose and effect of discriminating against African Americans and African-American homeowners, as well as residents and homeowners living in African-American neighborhoods in Baltimore. NovaStar's no row house policy has a similar discriminatory purpose and effect on Latinos and

2

Latino homeowners, as well as residents and homeowners living in Latino neighborhoods in Baltimore.

5.      There is no business justification for any of these three discriminatory lending policies and practices. Each policy treats persons protected by the FHA differently from non-protected groups, and each policy has a disproportionate adverse impact on persons protected by the FHA. NovaStar's blanket refusal to make loans secured by properties on Indian reservations or those used for adult foster care discriminates against Native Americans and people with disabilities, without regard to the creditworthiness of the borrower. Applicants who meet traditional lending criteria, such as a strong FICO score, low loan-to-value (LTV) and/or debt-to-income (DTI) ratios, steady income, and significant assets, are excluded from consideration for a loan based solely on whether the property is located on an Indian reservation or the disability of persons intending to reside in the property. Similarly, under NovaStar's no row house policy, applicants are excluded solely on the basis of property type without regard to whether they meet traditional lending criteria.

6.      If NovaStar applied traditional lending criteria, it would significantly reduce the adverse impact on Native Americans and people with disabilities, as well as African- American and Latino homeowners, and homeowners in majority African-American and Latino neighborhoods in Baltimore, without increasing the company's risk exposure.

7.      Upon information and belief, these discriminatory policies and practices have been in place and followed by NovaStar for a number of years and reflect the Defendants' current business practices. These policies and practices constitute continuing violations of the FHA.

8.      NovaStar's discriminatory lending policies and practices have caused, and

3

continue to cause, direct injury to Native Americans and homeowners living on Indian reservations, people with disabilities across the nation, and African-American and Latino residents and homeowners in Baltimore. NovaStar's refusal to provide loans secured by properties on Indian reservations and properties used for adult foster care limits homeownership and access to credit to Native Americans, and restricts housing options for people with disabilities. Its no row house policy impedes African-American and Latino borrowers and borrowers in African-American and Latino neighborhoods in Baltimore from receiving any loans at all. NovaStar's discriminatory lending policies and practices have also injured the NCRC by frustrating its mission of increasing fair and equal access to capital for underserved communities, and by requiring the NCRC to divert resources to investigate, eliminate, and counteract such practices.

## PARTIES

9.      Plaintiff NCRC is a national non-profit organization organized under the laws of the District of Columbia, with its principal place of business located at 727 15th Street NW, Suite 900, Washington, D.C. 20005. The NCRC was formed in 1990 by national, regional, and local organizations to develop and harness the collective energies of community reinvestment organizations from across the country. NCRC members represent and protect traditionally underserved and vulnerable populations. Its members include community development corporations, civil rights groups, community reinvestment advocates, local and state government agencies, and churches. One of the NCRC's primary missions is to increase fair and equal access to credit, capital, and banking services and products to individuals, regardless of race, national origin, or disability.

10.     Defendant NovaStar Financial, Inc. ("NFI") is a real estate investment fund

incorporated in the State of Maryland and headquartered in Missouri. Through its subsidiaries, NFI originates primarily single-family, non-conforming loans via a network of wholesale brokers and residential mortgage lenders throughout the nation. NFI provides the underwriting guidelines for its loans and originates, services, and securitizes its loans.

11.    Defendant NovaStar Mortgage, Inc. is incorporated in the State of Virginia and maintains its principal office in Missouri. NovaStar Mortgage, Inc. is a wholly-owned subsidiary of NFI and serves as NFI's primary loan origination unit. As of March 2007, NovaStar Mortgage, Inc. was the 16th largest residential subprime lender in the country.

12.    Defendant W. Lance Anderson, also known as Lance Anderson, is the President, Chief Operating Officer, and co-founder of NovaStar Financial, Inc. Mr. Anderson is also the President of NovaStar Mortgage, Inc. Mr. Anderson personally developed and implemented the discriminatory lending policies challenged in this First Amended Complaint. Upon information and belief, Mr. Anderson resides at 2100 West 56th Street, Mission Hills, Kansas 66208.

13.    Each of the Defendants was and is the agent, employee, and representative of the other Defendant. Each Defendant, in doing the acts or in omitting to act as alleged in this Complaint, was acting in the course and scope of its actual or apparent authority pursuant to such agencies, or the alleged acts or omissions of each Defendant as agent were subsequently ratified and adopted by each agent as principal.

## JURISDICTION AND VENUE

14.    This Court has jurisdiction over this matter pursuant to 42 U.S.C. §§3613, and 28 U.S.C. §§1331, 1343, because the claims alleged herein arise under the laws of the United States. Venue is proper in the District of Columbia because a substantial part of the events or omissions giving rise to the claim occurred in the District.

## FACTS

### A.    NovaStar's Nationwide No Indian Reservation Policy

15.     NovaStar maintains and publishes a policy that prohibits making loans secured by dwellings on Indian reservations across the country ("no Indian reservation policy"). Exh. A at 40. NovaStar's no Indian reservation policy is facially discriminatory based on race, color, racial composition, and/or national origin of the area in which the property is located, and explicitly treats loan applicants differently based on race, color, racial composition, and/or national origin.

16.     In addition to treating loan applicants differently on a prohibited basis, NovaStar's no Indian reservation policy has a significant disproportionate adverse impact on Native Americans and Native American homeowners.  According to 2000 Census data, 41.7% of Native American homeowners live on Indian reservations.  By comparison, only 1.8% of white homeowners live on Indian reservations.  Consequently, NovaStar's no Indian reservation policy excludes 41.7% of Native American homeowners from obtaining a loan from NovaStar, but only 1.8% of white homeowners, a ratio of more than twenty-three to one.

17.     NovaStar's no Indian reservation policy has the purpose and effect of limiting access to capital for Native Americans and Native American homeowners, and also limits the availability of housing to Native Americans.  Indian reservations exist in thirty-five (35) states. *See* 2000 Census Map of Indian Reservations, attached as Exh. B.  NovaStar lends in all of these states except Utah and Louisiana. *See* www.novastarhome.com/wherewelend.nsp.  According to 2000 Census data, Native Americans constitute 55% of the population of Indian reservations throughout the country, whereas Whites constitute only 33.7% of the reservation population.  On certain larger Indian reservations, however, the percentage of the population that is Native

6

American is even higher.  For example, the Navajo Nation Reservation in Arizona has a Native

American population of 96.4% compared with a white population of 2.2%; the Eastern

Cherokee Reservation in North Carolina has a Native American population of 82.4% compared

with a white population of 12.9%; and the Fort Peck Reservation in Montana has a Native

American population of 62% compared with a white population of only 34.9%.

18.     There is no business justification for NovaStar's no Indian reservation policy.

Under this policy, NovaStar excludes loans without regard to traditional lending criteria.

Applicants with substantial assets, a strong FICO score, a low LTV and/or DTI ratio, and steady

income, would not qualify for a loan of any size based solely on the fact that their property is

located on an Indian reservation.  This policy intentionally treats Native Americans and Native

American homeowners differently from non-Native American persons and homeowners, and has

a significant disproportionate adverse impact on residents and homeowners on Indian

reservations.  If NovaStar applied traditional lending criteria, it would significantly reduce the

adverse impact its policy has on Native Americans without increasing the company's risk

exposure.

**B.     NovaStar's Nationwide No Adult Foster Care Policy**

19.     NovaStar maintains and publishes a nationwide policy that prohibits making loans

secured by dwellings used for adult foster care ("no adult foster care policy").  Exh A at 40.  The

U.S. Department of Health and Human Services (HHS) defines adult foster care as that "intended

for adults with mental, sensory, and physical impairments," which "typically serves as an

alternative to other more restrictive types of residential care." *See*

www.acf.hhs.gov/programs/ocs/ssbg/docs/ssbg_focus_2003/older_adults.html.  This definition is

typical of that used by many state agencies across the country.  Michigan's Department of

Human Services, for example, defines adult foster care homes as "residential settings that provide 24-hour personal care, protection, and supervision for individuals who are developmentally disabled, mentally ill, physically handicapped or aged who cannot live alone but who do not need continuous nursing care." *See* http://www.michigan.gov/dhs/0,1607,7-124-5455_27716_27717-43059--,00.html. Similarly, Utah's Office of Licensing defines adult foster care as "the provision of care in homes which are conducive to the physical, social, emotional and mental health of disabled or elderly adults who are temporarily unable to remain in their own homes." *See* http://www.hslic.utah.gov/adultfostercare.htm. Likewise, Minnesota defines foster care for adults as "a program operating 24 hours a day that provides functionally impaired adults with food, lodging, protection, supervision, and household services in a residence." *See* MINN. STAT. § 245A.02 (2006). NovaStar's no adult foster care policy is thus facially discriminatory based on disability, and explicitly treats loan applicants differently based on their association with, or residing with, persons with disabilities. Because NovaStar's no adult foster care policy excludes homes typically licensed for people with disabilities, by definition it also has a significant disproportionate adverse impact on loan applicants associated with, or living with, persons with disabilities.

20.    NovaStar's no adult foster care policy has the purpose and effect of limiting access to capital for loan applicants based on their association with, or residing with, persons with disabilities, and also limits the availability of housing to persons with disabilities. According to 2000 Census data, 49.7 million people (19.3% of the population), have some type of "long lasting condition or disability." *See* www.census.gov/prod/2003pubs/c2kbr-17.pdf. As the percentage of the population 65 and older increases, the number of people with disabilities will increase as well, making even greater the need for loans secured by adult foster care homes.

8

*See* www.census.gov/population/projections/nation/summary/np-t3-c.pdf.

21.    There is no business justification for NovaStar's no adult foster care policy.

Under this policy, NovaStar excludes loans without regard to traditional lending criteria.

Applicants with substantial assets, a strong FICO score, a low LTV and/or DTI ratio, and steady

income, would not qualify for a loan of any size based solely on the fact that their property will

be used as an adult foster care home.  This policy intentionally treats dwellings that house people

with disabilities differently from dwellings that do not house such persons, and has an adverse

disparate impact on people with disabilities.  If NovaStar employed traditional lending criteria, it

would significantly reduce the adverse impact on people with disabilities by increasing the

capital available to owners of adult foster care homes without increasing the company's risk

exposure.

<strong>C.    <u>NovaStar's No Row House Policy In Baltimore</u></strong>

22.    In major metropolitan areas across the nation, residential housing patterns remain

highly segregated by race.  The vast majority of African Americans in urban areas reside in

majority black census tracts, while the vast majority of white residents reside in majority white

census tracts.  In major cities across the nation, such as Baltimore, racial segregation is starkly

defined by neighborhood; very few mixed or integrated neighborhoods exist.

23.    The metropolitan statistical area ("MSA") of Baltimore-Towson, MD consists of

Anne Arundel County, Baltimore County, Baltimore City, Carroll County, Harford County,

Howard County, and Queen Anne's County.  After decades of white flight from Baltimore City,

the Baltimore-Towson MSA remains highly segregated.  According to 2005 census estimates,

African Americans constitute 65.2% of the total population of Baltimore City.  In contrast,

African Americans in Baltimore County, which almost completely surrounds Baltimore City,

9

constitute only 24% of the population. Two-thirds of African Americans in this MSA (67%) reside in majority black census tracts, and nearly 95% of white residents live in majority white census tracts.

24.    Property type is also strongly correlated to the racial composition of neighborhoods in Baltimore City. Upon information and belief, nearly two-thirds of all row houses in Baltimore City are occupied by African Americans, and the majority of row houses are located in African-American neighborhoods.

25.    NovaStar maintains a discriminatory policy and practice of denying its loan products to any applicant with a row house in Baltimore. Under this no row house policy, NovaStar automatically rejects any applicant, without regard to traditional lending criteria, based solely on the type of dwelling securing the loan. Thus, for example, a loan applicant in Baltimore with a row house, despite having substantial assets, a strong FICO score, a low LTV and/or DTI ratio, and steady income, would not qualify for a loan of any size. This policy intentionally treats African-American homeowners and predominantly African-American neighborhoods in Baltimore differently from non-African-American homeowners and neighborhoods in Baltimore, and has a disproportionate adverse impact on African Americans and persons living in predominantly African-American neighborhoods in the City of Baltimore. NovaStar's no row house policy has a similar discriminatory purpose and effect on Latinos and residents of Latino neighborhoods in Baltimore.

26.    In January 2006, a tester for the NCRC called NovaStar and told the agent that he was interested in information about a loan to purchase a house in Baltimore. The NovaStar agent asked what type of house he was buying and asked for the location of the house. After the tester stated that the house was a row house, the agent stated that the company had stopped financing

row houses a few months before the tester's call.  The agent asked where the house was located, and then asked a colleague if he knew where the house was located.  After looking up the address, the agent informed the tester that "we don't do row houses in Baltimore."

27.    In February 2006, another tester for the NCRC called NovaStar and requested information about financing a row house in Baltimore.  The NovaStar agent who answered the call stated that the company was not currently financing row houses in Baltimore.  Upon information and belief, NovaStar has continued to enforce this policy up to the present time.

28.    There is no business justification for NovaStar's no row house policy.  If NovaStar employed traditional lending criteria, rather than an applicant's property type, it would significantly reduce the adverse impact that this policy has on African-American and Latino homeowners and homeowners in majority African-American and Latino neighborhoods in Baltimore without increasing the company's risk exposure.

29.    On March 16, 2006, the NCRC filed a complaint with the Department of Housing and Urban Development (HUD) alleging that NovaStar's no row house policy violated the FHA. As of May 9, 2007, HUD had not issued a determination on this complaint.

## INJURY CAUSED BY DEFENDANTS' POLICIES AND PRACTICES

30.    Through numerous workshops, conferences, systemic testing, reports, education and outreach, and "best practice" compliance initiatives, the NCRC has provided education, training, and technical assistance to its members, community organizations, and advocates at the local, regional, and national level to promote fair lending and access to capital in low-income and minority communities across the country.  The unlawful discriminatory policies and practices of NovaStar identified above have injured the NCRC by:  (a) interfering with those efforts and programs of the NCRC intended to promote fair lending; and (b) requiring the NCRC

11

to commit scarce resources, including substantial staff time, to investigate complaints and to review NovaStar's lending practices, including its three discriminatory policies that adversely affect minorities and people with disabilities.

31.    The NCRC has devoted and continues to devote significant resources to addressing lending discrimination against Native Americans, people with disabilities and minorities affected by discriminatory policies. In May 2003, the NCRC and the Native American Indian Housing Council (NAIHC) conducted a survey of Native Americans on Indian reservations to determine areas where abusive and discriminatory lending to Native Americans was most prominent. The NCRC and NAIHC later issued a report in June 2003 with these survey results and began a campaign that continues to this day to educate the public about lending discrimination against Native Americans and the need for greater access to capital for Native Americans, particularly those on Indian reservations. The NCRC has also worked and continues to work with member organizations advocating for people with disabilities and racial minorities to educate and counsel the public about discriminatory lending policies and practices. The NCRC's efforts include working with businesses and consumers to address the effects of discriminatory lending and/or predatory lending in communities with less access to capital.

32.    NovaStar's discriminatory lending policies and practices have required the NCRC to engage in an education and outreach campaign, and to develop educational materials to identify and counteract the unlawful actions of NovaStar, thus diverting the NCRC's resources from other testing, education, counseling, and capacity-building services. Defendants' discriminatory lending policies and practices have also frustrated the NCRC's mission and purpose of increasing fair and equal access to credit, capital, and banking services and products for all Americans, regardless of race, national origin, or disability. Defendants' discriminatory

12

lending policies and practices have required the NCRC, and will require the NCRC in the future, to spend additional resources to counteract NovaStar's discriminatory conduct.

33.    As a result of Defendants' discriminatory conduct, individuals in the communities served by the NCRC have been:  (a) discouraged from applying for loans; and (b) deprived of equal access to credit, capital, and banking services and products.  As a result of Defendants' discriminatory conduct, communities served by the NCRC and its member organizations have been denied the flow of capital, the provision of banking services, and the economic growth that accompanies capital and banking services.  In response, the NCRC has made substantial efforts and expended considerable resources to investigate the existence and effects of NovaStar's lending policies and to ensure equal lending opportunities for potential borrowers.

34.    The NCRC has been, and continues to be, adversely affected by the acts, policies, and practices of Defendants and/or their respective agents.

35.    The acts, policies, and practices of Defendants set forth herein constitute continuing violations of the FHA.  Unless enjoined, NovaStar will continue to engage in the unlawful acts and practices described above.

36.    Defendants' unlawful actions described above were, and are, intentional and willful, and/or have been, and are, implemented with callous and reckless disregard for the federally protected rights of the NCRC, its constituent members, and the individuals and communities it serves.

## CAUSE OF ACTION
(Federal Fair Housing Act)

37.     Plaintiff repeats and incorporates by reference all allegations contained in

Paragraphs 1 through 36 as if fully set forth herein.

38.     Defendants' acts, policies, and practices, including those through its agents, as

described herein, violate the Fair Housing Act, as amended, 42 U.S.C. §§ 3604(a), (b), (c), and

(f) and 3605:

(a)     Defendants' acts, policies, and practices, have made and continue to make

housing unavailable on the basis of race, color, and/or national origin, in violation of 42 U.S.C.

§ 3604(a);

(b)     Defendants' acts, policies, and practices, have provided and continue to

provide different terms, conditions, and privileges of sale of housing, as well as different services

and facilities in connection therewith, on the basis of race, color, and/or national origin, in

violation of 42 U.S.C. § 3604(b);

(c)     Defendants' published policies and statements have expressed and

continue to express a preference on the basis of race, color, handicap, and/or national origin, in

violation of 42 U.S.C. § 3604(c);

(d)     Defendants' acts, policies, and practices, have made and continue to make

housing unavailable on the basis of handicap, in violation of 42 U.S.C. § 3604(f)(1);

14

(e)     Defendants' acts, policies, and practices, have provided and continue to provide different terms, conditions, and privileges of sale of housing, as well as different services and facilities in connection therewith, on the basis of handicap, in violation of 42 U.S.C. § 3604(f)(2); and

(f)     Defendants' acts, policies, and practices, have provided and continue to provide different terms, conditions and privileges on the basis of race, color, handicap and/or national origin in connection with the making of real estate-related transactions, in violation of 42 U.S.C. § 3605.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury on all issues so triable as of right.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that the Court grant it the following relief:

(1)     enter a declaratory judgment that the foregoing acts, policies, and practices of the Defendants violate the Fair Housing Act of 1968, as amended, 42 U.S.C. § 3601 *et seq;*

(2)     enter a preliminary injunction enjoining the Defendants and their directors, officers, agents and employees from continuing to publish, implement, and enforce the illegal, discriminatory conduct described herein pending the entry of a final judgment in this matter;

(3)     enter a permanent injunction enjoining the Defendants and their directors, officers, agents and employees from continuing to publish, implement, and enforce the illegal, discriminatory conduct described herein and directing the Defendants and their directors,

15

officers, agents and employees to take all affirmative steps necessary to remedy the effects of the illegal, discriminatory conduct described herein and to prevent similar occurrences in the future;

      (4)     award compensatory damages to Plaintiff in an amount to be determined by the jury that would fully compensate Plaintiff for the diversion of resources and frustration of mission that have been caused by the conduct of the Defendants alleged herein;

      (5)     award punitive damages to Plaintiff in an amount to be determined by the jury that would punish the Defendants for the willful, wanton and reckless conduct alleged herein and that would effectively deter similar conduct in the future;

      (6)     award Plaintiff its reasonable attorneys' fees and costs pursuant to 42 U.S.C. §§ 3613(c)(2); and

      (7)     order such other relief as this Court deems just and equitable.

August 27, 2008.

                                       _Bradley H. Blower_

                              John P. Relman    (Bar No.  405500)
                              Bradley H. Blower  (Bar No.  421112)
                              Glenn Schlactus   (Bar No.  475950)
                              RELMAN & DANE, PLLC
                              1225 19th Street NW, Suite 600
                              Washington, DC 20036
                              (202) 728-1888
                              (202) 728-0848 (fax)
                              jrelman@relmanlaw.com
                              bblower@relmanlaw.com
                              gschlactusa@relmanlaw.com

                              *Attorneys for Plaintiff*

**Exhibit A**





Program Manual



# Program Manual

**Effective February 6, 2007**

Effective 02/06/07

07 0861

**FILED**

MAY − 9 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Program Manual 

# Table of Contents

**Welcome to NovaStar**

**Chapter 1 – Mortgage Loan Submission**

1.1   Using NovaStar's Automated Underwriting System (NovaStarIS)
1.2   Loan Submission
1.3   Interest Rate Lock-In
1.4   Credit Grade Amendment
1.5   Product Change
1.6   Fees
1.7   Third Party Originations
1.8   Net Tangible Benefit

**Chapter 2 – Credit**

2.1   Type of Credit Report Required
2.2   Credit Grading
2.3   Minimum Credit Requirements
2.4   Qualifying Rates
2.5   Credit Score Analysis
2.6   Verification of Mortgage/Rent
2.7   No Housing History
2.8   Borrower(s) Who Already Own Real Estate
2.9   Payment Shock
2.10  Standard Automated DTI Exceptions
2.11  Installment Loans
2.12  Collections, Judgments, Charge-off, Tax Liens and Repossessions
2.13  Bankruptcies
2.14  Foreclosures/Notice of Default (NOD)/Forbearance
2.15  Consumer Credit Counseling Services
2.16  Lease/Rent with Option to Purchase (Owner-occupied only)
2.17  Rent Credits
2.18  Installment Land Contract/All Inclusive Trust Deed
2.19  Mortgage/Rents Held by Private Parties
2.20  Co-Signed Obligations
2.21  Deferred Student Loans

Program Manual 

## Table of Contents

### Chapter 3 – Income

3.1    Full Documentation
3.2    Limited Documentation
3.3    Stated Income
3.4    NINA/No Doc
3.5    Employment by a Relative
3.6    Income Analysis (Income Documentation Requirements Table)
3.7    Part-Time/Seasonal/Second Job Income
3.8    Unemployment and Welfare Benefits
3.9    Notes Receivable
3.10   Trust Income
3.11   Pension Income
3.12   VA Benefits
3.13   Disability Income
3.14   Mortgage Interest Differential Payments
3.15   Car Allowances
3.16   Trailing Spouse Income
3.17   Deferred Income
3.18   Future Raises
3.19   Disposable Income
3.20   Non-Occupant Co-Mortgagor

### Chapter 4 – Assets

4.1    Verification of Funds
4.2    Gift Funds
4.3    Gifts of Equity
4.4    Funds Borrowed Against Other Assets
4.5    Sale of Other Assets
4.6    Bridge Loans
4.7    IRA/Keogh/401K
4.8    Relocation Packages
4.9    Subordinate Financing
4.10   Contributions or Secondary Financing by Non-Profit Agencies
4.11   Silent Seconds
4.12   Ineligible Sources of Down Payment
4.13   Reserve Requirements
4.14   Seller Concessions

Program Manual 

# Table of Contents

## Chapter 5 – Collateral and Appraisal Requirements

5.1    Acceptable Property Types
5.2    Minimum Value Requirements
5.3    Unacceptable Property Types
5.4    Documentation
5.5    Appraisal Updates
5.6    Appraiser Qualification Requirements
5.7    Condominiums
5.8    Modular Homes
5.9    HUD Homes
5.10   Acreage, Unique Homes, and Rural Properties
5.11   Multiple Parcels/Multiple Tax ID Numbers
5.12   Land to Value Ratios
5.13   Leaseholds
5.14   New Construction
5.15   Two to Four Family Units
5.16   Concentration/Density Limitations
5.17   Documented Improvements
5.18   Prior Transfers
5.19   Security Bars
5.20   Mixed Use
5.21   Property Rights Appraised
5.22   Review Appraisal and Second Appraisal Requirements
5.23   Property Identification
5.24   Neighborhood
5.25   Neighborhood Analysis
5.26   Present Land Use
5.27   Predominant Value
5.28   Age of Subject Property
5.29   Site View
5.30   Environmental Reports
5.31   Utilities and Streets
5.32   Highest and Best Use
5.33   Improvements
5.34   Floor Plans/Building Sketches
5.35   Structure
5.36   Permanent Heat Source
5.37   Improvement Analysis
5.38   Remaining Economic Life
5.39   Valuation Analysis

**Program Manual**



## Table of Contents

5.40   Square Footage
5.41   Amenities/Extras/Special Items
5.42   Deferred Maintenance
5.43   Depreciation
5.44   Market Data
5.45   Prior Sale/Listing History
5.46   Comparables
5.47   Adjustments to Comparables
5.48   Time Adjustments
5.49   Sale or Financing Concession
5.50   Comments and Final Reconciliation
5.51   Sales Price Discrepancy
5.52   Minimums

### Chapter 6 – Miscellaneous

6.1    Escrow Holdbacks
6.2    Age of Documents
6.3    Ownership
6.4    Loans to Customers and Their Employees
6.5    Legal Resident Aliens
6.6    Foreign National Program
6.7    Maximum LTV and Loan Amounts
6.8    Ownership Seasoning Requirements
6.9    Cash-Out Refinances
6.10   Non-Arm's Length Transaction
6.11   Inherited/Gifted Properties
6.12   Number of Loans to One Person
6.13   Refinancing Zero or Low Interest Rate Loans
6.14   Home Improvement Policy

### Chapter 7 – Closing Procedures

7.1    Closing Procedure for Loans Closed in NovaStar's Name
7.2    Closing Procedure for Loans Closed in Your Name with Docs Prepared by
       NovaStar
7.3    Hazard Insurance
7.4    Flood Insurance
7.5    Wind Insurance

Effective 02/06/07

Program Manual



## Table of Contents

7.6    Title Commitment
7.7    Power of Attorney
7.8    Leasehold Property
7.9    Truth-in-Lending/Rescission
7.10   Prepayment Penalties
7.11   Maximum Points/Fees
7.12   Texas Cash Out Transactions
7.13   Escrow Closing States
7.14   Natural Disasters

**Chapter 8 – Correspondent Loan Transactions/Closed Loan Purchases**

8.1    Correspondent Approval Process
8.2    Delivery Requirements
8.3    Locking/Pricing
8.4    Loan Documents
8.5    Closing the Loan
8.6    First Payment Due NovaStar
8.7    Borrower Notification by Correspondent
8.8    Servicing
8.9    Hazard Insurance/Flood Insurance
8.10   Flood Certification
8.11   Tax Service Contracts

**Chapter 9 – Payment Option ARM Guidelines**

9      Payment Option ARM Guidelines

**Chapter 10 – Interest Only Guidelines**

10     Interest Only Guidelines

Program Manual 

### 5.2    Minimum Value Requirements

NovaStar's minimum property value requirements are:

> ➢ U. S. Citizens and Resident Aliens:   None
>
> ➢ Non-Resident Aliens:                   $75,000
>
> ➢ Piggyback Program:                      $75,000

### 5.3    Unacceptable Property Types

NovaStar will **not** make loans secured by the property types listed below:

> ➢ Properties secured by Habitat for Humanity loans.  (Revised 1/9/07)
>
> ➢ Properties subject to a life estate.                (Revised 1/9/07)
>
> ➢ Rural properties in Alaska.                          (Revised 5/16/06)
>
> ➢ Stated, NINA and NoDoc loans in the state of Ohio.
>
> ➢ Properties in default or foreclosure where the loan is a non-arms length transaction and may be considered a bail-out.  (Revised 7/24/06)
>
> ➢ Properties in Alabama on which a foreclosure has been completed within the 12 months prior to NovaStar closing a new loan on the property (due to redemption period required by state statute).
>
> ➢ Relocated homes.
>
> ➢ Manufactured/mobile housing and manufactured/mobile homes with stick-built additions.
>
> ➢ Commercial use or a mix of commercial/residential properties (home-based business may be acceptable depending on the type of business).
>
> ➢ Time-share units.
>
> ➢ Cooperative units.

Continued . . .



**Program Manual**

**Unacceptable Property Types** continued . . .

> Properties currently listed for sale.

Note: Properties that have been listed for sale in the preceding 12 months may be acceptable, with evidence that the listing has expired or been cancelled at least 90 days before submission. Properties listed for sale within the last 90 days are unacceptable. A satisfactory explanation must be included describing why the property was listed and a copy of MLS to verify the most recent listing price, any listing reductions and length of time listed. Value will be based on the lesser of the appraised value or last listing price. Other restrictions may apply.
(Revised 1/9/07)

> Unimproved or raw land.

> Earth homes.

> Geodesic domes.

> Floating homes.

> Cross-collateralized properties that are not adjacent to each other.

> Homes that appear to be a major over-improvement or are atypical for the area.

> Properties located on Indian reservations.

> Single-family residences with less than 750 sq. ft. living space, without market support.

> Condominiums with less than 500 sq. ft. living space, without market support.

> Boarding/Rooming Houses, including Bed and Breakfast Inns.

> Properties used for adult foster care.

> Properties used for illegal purposes.

> Properties that cannot be completely rebuilt due to zoning restrictions.

> Working Farms.

> Condominium projects with less than 5 units.

> Condominium conversion projects where the HOA has not been turned over to the home owners for at least one year and/or does not meet all other NovaStar condominium guidelines.
(Revised 8/15/06)

**Exhibit B**



American Indian Reservations

MAP KEY
■ Federal American
  Indian Reservations
• State American
  Indian Reservations

07 0861
FILED

MAY - 9 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT