UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL COMMUNITY
REINVESTMENT COALITION,                    )
                                           )
                    Plaintiff,             )
                                           )
        v.                                 )    Civil Action No. 07-861 (RCL)
                                           )
NOVASTAR FINANCIAL, INC. and               )
NOVASTAR MORTGAGE, INC.,                   )    **ORAL ARGUMENT REQUESTED**
                                           )
                    Defendants.            )
                                           )

## DEFENDANTS NOVASTAR FINANCIAL, INC., AND NOVASTAR MORTGAGE, INC.'S OPPOSITION TO PLAINTIFF'S MOTION TO AMEND ITS COMPLAINT TO JOIN W. LANCE ANDERSON AS A DEFENDANT

WEINER BRODSKY SIDMAN KIDER PC

By: /s/ David M. Souders
Mitchel H. Kider (Bar No. 358531)
David M. Souders (Bar No. 441491)
1300 19th Street, NW, Fifth Floor
Washington, DC 20036-1609
Telephone: (202) 628-2000
Facsimile: (202) 628-2011
Email: kider@wbsk.com
Email: souders@wbsk.com

Dated: September 8, 2008

# TABLE OF CONTENTS

TABLE OF CONTENTS...................................................................... i

TABLE OF AUTHORITIES ............................................................. ii

INTRODUCTION ................................................................................1

PROCEDURAL HISTORY AND SUMMARY OF ALLEGATIONS ...........................2

STANDARD FOR AMENDING A COMPLAINT .....................................5

PLAINTIFF'S MOTION TO AMEND SHOULD BE DENIED AS
FUTILE AND FRIVOLOUS.................................................................5

    A.   Amendment Would Be Futile Because Plaintiff Fails To
       Establish A Basis For Personal Jurisdiction Over Mr. Anderson.................5

        1.   No Basis Exists To Assert General Personal Jurisdiction
            Over Mr. Anderson ......................................................................8

        2.   No Basis Exists To Assert Specific Personal Jurisdiction
            Over Mr. Anderson ......................................................................9

    B.   Plaintiff's Claim Against Mr. Anderson Is Frivolous,
       If Not Malicious.......................................................................14

CONCLUSION....................................................................................20

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Atlantigas Corp. v. Nisource, Inc.*, 290 F. Supp. 2d 34 (D.D.C. 2003) .......................................7, 8

*Blue v. U.S. Department of Army*, 914 F.2d 525 (4th Cir. 1990)....................................................19

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985) ..........................................................12, 13

*Carrion v. Yeshiva University*, 535 F.2d 722 (2d Cir. 1976) ............................................................14

*D'Onofrio v. SFX Sports Group, Inc.*, 534 F. Supp. 2d 86 (D.D.C. 2008) ..................6, 7, 8, 9, 12

*First Chicago International v. United Exch. Co., Ltd.*,
    836 F.2d 1375 (D.C. Cir. 1988) ................................................................................................8

*Flocco v. State Farm Mutual Automobile Insurance Co.*, 752 A.2d 147 (2000) .................7, 9, 12

*Foman v. Davis*, 371 U.S. 178 (1962) ...............................................................................................5

*GTE New Media Service Inc. v. BellSouth Corp.*,
    199 F.3d 1343 (D.C. Cir. 2000) .............................................................................................6, 7

*Harris v. Marsh*, 679 F. Supp. 1204 (E.D.N.C. 1987) .....................................................................19

*Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408 (1984) ....................................6

*Japan Petrol. Co. (Nigeria) Ltd. v. Ashland Oil, Inc.*,
    456 F. Supp. 831 (D. Del. 1978) ..............................................................................................2

*Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770 (1984) ...................................................................7

*Kopff v. Battaglia*, 425 F. Supp. 2d 76 (D.D.C. 2006) ..........................................................5, 7, 12

*Quinto v. Legal Times*, 506 F. Supp. 554 (D.D.C. 1981) ..........................................7, 9, 10, 11, 12

*Richard v. Bell Atlantic Corp., Inc.*, 976 F. Supp. 40 (D.D.C. 1997) ....................................11, 12

*Savage v. Bioport, Inc.*, 460 F. Supp. 2d 55 (D.D.C. 2006) ...........................................................6

*Transamerica Leasing, Inc. v. La Republica de Venezuela*,
    200 F.3d 843 (D.C. Cir. 2000) ..................................................................................................2

*United States v. Ferrara*, 54 F.3d 825 (D.C. Cir. 1995) ..........................................................6, 12

*Wiggins v. Equifax, Inc.*, 853 F. Supp. 500 (D.D.C. 1994) ........................................7, 9, 10, 11, 12

*World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980) ......................................7, 12 13

## STATUTES

D.C. Code § 13-243 ........................................................................................................................6

D.C. Code § 13-422 ......................................................................................................................6, 8

D.C. Code § 13-423(a) ..............................................................................................................6, 9, 10

Fair Housing Act, 42 U.S.C. § 3601, *et seq.* ..................................................................................1

42 U.S.C. § 3604(a), (b), (c) and (f) ...............................................................................................3

42 U.S.C. §§ 3604 and 3605 ...........................................................................................................1

42 U.S.C. § 3605(a) .........................................................................................................................3

## RULES

Fed. R. Civ. P. 12(b)(2) ...............................................................................................................5, 8

Fed. R. Civ. P. 15(a) ........................................................................................................................5

## I.    INTRODUCTION

Plaintiff's original Complaint alleges that NovaStar Mortgage, Inc. ("NMI") and

NovaStar Financial, Inc. ("NFI") maintain policies of not making mortgage loans secured by:

(1) properties located on Indian reservations; (2) properties used as adult foster care facilities;

and (3) row houses located in Baltimore, Maryland.  Plaintiff contends that these lending policies

violate 42 U.S.C. §§ 3604 and 3605 of the federal Fair Housing Act, 42 U.S.C. § 3601, *et seq.*

("FHA").  Plaintiff has now moved to amend its Complaint to add an officer of NFI and NMI,

W. Lance Anderson, as an individual defendant.  Plaintiff's Motion to Amend should be denied

because the claims against Mr. Anderson are both futile and frivolous.  First, glaringly absent

from the Proposed First Amended Complaint ("PFAC") are any allegations establishing this

Court's ability to assert personal jurisdiction over Mr. Anderson, a resident of the State of

Kansas who works in Kansas City, Missouri, and has no substantial contact with the District of

Columbia.  The PFAC does not contain any allegations that he conducted any business

transactions in the District of Columbia in an individual capacity (as opposed to his corporate

capacity as an officer of NMI and NFI).  Nor are there any allegations that Mr. Anderson acted in

an individual capacity in committing the purported acts and omissions complained of in the

PFAC.  Nor could any such allegations be leveled against Mr. Anderson, as evidenced by Mr.

Anderson's declaration attached to this Opposition.  Quite simply, there are no allegations that

satisfy Plaintiff's burden of establishing this Court's jurisdiction over Mr. Anderson.

Second, Plaintiff's claims against Mr. Anderson are without merit.  Plaintiff seeks to add

Mr. Anderson as a defendant based on the barest of allegations and "evidence," and to impose

personal liability on him for alleged acts he performed within the scope of his duties as an officer

of NFI and NMI.  Plaintiff's only purported basis for adding Mr. Anderson is its unreasonable

interpretation of NMI's responses to three interrogatories propounded by Plaintiff.  Plaintiff takes issue with Mr. Anderson's business decisions as an officer of NMI: 1) not to participate in the Section 184 Home Loan Guarantee Program regarding lending on Indian reservations and Indian country administered by the United States Department of Housing and Urban Development ("Section 184 Program"); 2) to stay focused on NMI's business model by not making loans on residential property used for commercial purposes, including, but not limited to adult foster care; and 3) to cease lending on Baltimore row houses for a period of time because such properties were plagued by well-documented appraisal fraud.

Plaintiff's attempt to amend the Complaint must be denied because there is no basis for asserting personal jurisdiction over Mr. Anderson and because the attempt to impose personal liability on Mr. Anderson, who was acting solely in his capacity as an officer of NMI implementing policies that have a legitimate business justification, is inappropriate and unjustified.

## II.    PROCEDURAL HISTORY AND SUMMARY OF ALLEGATIONS

Plaintiff – a non-profit organization – alleges violations of the FHA.  Complaint ("Compl.") ¶ 9; Proposed First Amended Complaint ("PFAC") ¶ 9.  Plaintiff asserts that NMI and NFI – a national mortgage lender and its parent holding company, respectively[1] – maintain

---

[1]    Defendants reiterate that NFI is not a proper party to this lawsuit.  At the appropriate time, Defendants will demonstrate that, contrary to Plaintiff's allegation (Compl. ¶ 10; PFAC ¶ 10), NFI does not provide "underwriting guidelines for its loans" and, in fact, does not originate, service or securitize loans.  NFI's subsidiaries, including NMI, perform those actions.  NFI is simply a corporate parent.  Likewise, plaintiff's agency theory (Compl.  ¶ 12; PFAC ¶ 13), lacks any basis in fact.  Ordinarily, a parent corporation will not be held liable for the actions of its subsidiary.  *See, e.g.*, *Transamerica Leasing, Inc. v. La Republica de Venezuela*, 200 F.3d 843, 849 (D.C. Cir. 2000) ("At a minimum, however, we can confidently state that the relationship of principal and agent does not obtain unless the parent has manifested its desire for the subsidiary to act upon the parent's behalf, the subsidiary has consented so to act, the parent has the right to exercise control over the subsidiary with respect to matters entrusted to the subsidiary, and the parent exercises its control in a manner more direct than by voting a majority of the stock in the subsidiary or making appointments to the subsidiary's Board of Directors."); *accord Japan Petrol. Co. (Nigeria) Ltd. v. Ashland Oil, Inc.*, 456 F. Supp. 831 (D. Del. 1978).

2

three corporate policies that each violate 42 U.S.C. § 3604(a), (b), (c) and (f) and 42 U.S.C. § 3605(a). Compl. ¶¶ 10-11, 37; PFAC ¶¶ 10-11, 38.

The first policy challenged is an alleged prohibition on making mortgage loans secured by dwellings on Indian reservations. Compl. ¶ 14; PFAC ¶ 15. Plaintiff contends not only that this policy is facially discriminatory, but also that it has a disproportionate impact on Native Americans. Compl. ¶ 15; PFAC ¶ 16. The second policy is an alleged prohibition on making mortgage loans secured by dwellings used for adult foster care. Compl. ¶ 18; PFAC ¶ 19. Plaintiff similarly contends that this second policy is facially discriminatory, and has a disproportionate impact on people with disabilities. Compl. ¶ 18; PFAC ¶ 19. Lastly, plaintiff alleges that NMI and NFI maintain a policy of denying mortgage loans to applicants with a row house in Baltimore, Maryland. Compl. ¶ 24; PFAC ¶ 25. Plaintiff contends that the "no-row house" policy is facially discriminatory, and has a disproportionate impact on African Americans and Latinos in Baltimore. Compl. ¶ 24; PFAC ¶ 25. Plaintiff further alleges that, as a result of these policies, it has spent resources to counteract the supposed discrimination. Compl. ¶ 31; PFAC ¶ 32. Plaintiff asks for injunctive relief and damages in connection with this action. Compl. ¶ 1; PFAC ¶ 1.

Plaintiff now seeks to add an individual, W. Lance Anderson, as a defendant in this action. Mr. Anderson is the President, Chief Operating Officer, and co-founder of NFI, as well as the President of NMI. PFAC ¶ 12. Mr. Anderson resides in Mission Hills, Kansas. Declaration of W. Lance Anderson ("Anderson Decl.") (Exhibit A, hereto). He does not personally maintain an office in the District of Columbia. He works in NFI and NMI's offices located in Kansas City, Missouri, and ordinarily make his business decisions as an officer of NFI and NMI from that location. *Id.* ¶¶ 6, 7.

3

Plaintiff's purported basis for adding Mr. Anderson as a defendant in this matter is NMI's responses to Interrogatory Nos. 2, 6, and 8. Opening Brief, p. 2-3. Interrogatories Nos. 2, 6 and 8 asked NMI to, "[i]dentify and describe in detail the role of all individuals responsible for NovaStar's 'policy regarding making loans secured by properties located on Indian reservations or in Indian Country,' 'properties used for adult foster care,' and 'row houses in Baltimore, Maryland.'" Opening Brief, Exhibit 1, Attachment 2. In response, NMI objected to the term "responsible for" as used in Interrogatories 2, 6 and 8 as vague and ambiguous, then, without waiving its objections, identified Mr. Anderson since he was the President of NMI, and, as such, held ultimate authority over all policy decisions. *Id.* Nowhere in its responses does NMI ever state that "Mr. Anderson personally developed and implemented the discriminatory lending policies challenged in this First Amended Complaint," as alleged by Plaintiff in the PFAC. *See id.* Plaintiff's truncated recitation of NMI's responses to Interrogatories 2, 6 and 8 completely ignores NMI's objections, and more specifically, NMI's objection to the term "responsible for" as vague and ambiguous. Opening Brief, p. 2-3.

Based on the above interrogatory responses, Plaintiff concocted the following conclusory allegations against Mr. Anderson:

> Defendant W. Lance Anderson, also known as Lance Anderson, is the President, Chief Operating Officer, and co-founder of NovaStar Financial, Inc. Mr. Anderson is also the President of NovaStar Mortgage, Inc. Mr. Anderson personally developed and implemented the discriminatory lending policies challenged in this First Amended Complaint. Upon information and belief, Mr. Anderson resides at 2100 West 56th Street, Mission Hills, Kansas 66208.

PFAC, ¶ 12. This is the only paragraph that refers to Mr. Anderson by name. The other charging allegations in the PFAC – which previously attributed the same conduct to NFI and NMI – simply lump Mr. Anderson with NMI and NMI, referring to them collectively as "NovaStar" or "Defendants." *Compare* Compl. ¶¶ 1, 14-27, 31-32, 34-35, 37 with PFAC ¶¶ 1,

4

15-28, 32-33, 35-36, 38. Based on these sparse, conclusory allegations and Plaintiff's distorted interpretation of NMI's responses to three interrogatories propounded by Plaintiff (which completely ignore NMI's duly preserved objections), Plaintiff seeks to assert personal liability against Mr. Anderson.

## III.    STANDARD FOR AMENDING A COMPLAINT

Pursuant to Federal Rule of Civil Procedure 15, once a responsive pleading has been filed, a plaintiff may amend its complaint only with leave of court. Fed. R. Civ. P. 15(a). Leave to amend a complaint is granted under Rule 15(a) of the Federal Rules of Civil Procedure "when justice so requires." *Foman v. Davis*, 371 U.S. 178, 182 (1962). Leave to amend is not automatic; it is appropriately denied when any of various factors, including bad faith, futility, and undue prejudice, are present. *Id.* A court may deny a motion to amend a complaint if the proposed claim would not survive a motion to dismiss. *Id.* at 179.

## IV.    PLAINTIFF'S MOTION TO AMEND SHOULD BE DENIED AS FUTILE AND FRIVOLOUS

### A.    Amendment Would Be Futile Because Plaintiff Fails To Establish A Basis For Personal Jurisdiction Over Mr. Anderson.

Amending the Complaint to add Mr. Anderson as a defendant would literally be an exercise in futility because the PFAC would not survive a motion to dismiss for lack of personal jurisdiction over Mr. Anderson pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure.

There are two distinct variants of personal jurisdiction:

"(1) general, 'all purpose' adjudicatory authority to entertain a suit against a defendant without regard to the claim's relationship *vel non* to the defendant's forum-linked activity, and (2) specific jurisdiction to entertain controversies based on acts of a defendant that touch and concern the forum. *Kopff v. Battaglia*, 425 F. Supp. 2d 76, 81 (D.D.C. 2006) (citations omitted)). General jurisdiction sets a high bar, requiring a defendant's contacts with a forum to be "continuous and systematic" before forcing a defendant to defend a

suit arising out of any subject matter whether or not related to the forum. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 415-16, (1984)). Specific jurisdiction, by contrast, requires a lesser showing that nevertheless must satisfy a two-step inquiry: (1) jurisdiction over the defendant must be authorized by the forum's long-arm statute; and (2) the exercise of that jurisdiction must satisfy the federal requirement of constitutional due process. *See United States v. Ferrara*, 54 F.3d 825, 828 (D.C. Cir. 1995)).

*D'Onofrio v. SFX Sports Group, Inc.*, 534 F. Supp. 2d 86, 90 (D.D.C. 2008)

A District of Columbia court may exercise personal jurisdiction over a person who is "domiciled in, organized under the laws of, or maintaining [a] principal place of business in, the District of Columbia as to any claim for relief." D.C. Code § 13-422. "If a defendant does not reside within or maintain a principal place of business in the District of Columbia, then the District's long-arm statute, D.C. Code § 13-243, provides the only basis in which a court may exercise personal jurisdiction over the defendant." *Savage v. Bioport, Inc.*, 460 F. Supp. 2d 55, 60 (D.D.C. 2006).

For non-resident defendants, the Court engages in a two-part inquiry in order to determine whether it may exercise personal jurisdiction. First, the court must determine whether specific jurisdiction may be exercised under the District of Columbia's long-arm statute. *GTE New Media Serv. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1347 (D.C. Cir. 2000). Under the District's long-arm statute, a District of Columbia court may exercise personal jurisdiction over a non-resident defendant who either: (1) transacts business in the District, (2) contracts to supply services in the District; (3) causes tortious injury in the District by an act or omission in the District, or (4) causes tortious injury in the District by an act or omission outside the District. D.C. Code § 13-423(a). When jurisdiction over a person is based solely upon the long-arm statute, only a claim for relief arising from acts enumerated in the statute may be asserted against the defendant. D.C. Code § 13-423(b). Second, the court determines whether the exercise of

6

personal jurisdiction satisfies due process requirements. *GTE New Media Serv. Inc.*, 199 F.3d at 1347.  A court's jurisdiction over a defendant satisfies the demands of due process when there are "minimum contacts" between the defendant and the forum "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980) (internal quotes omitted).

"Personal jurisdiction over the employees or officers of a corporation in their individual capacities must be based on their personal contacts with the forum and not their acts and contacts carried out solely in a corporate capacity." *Wiggins v. Equifax, Inc.*, 853 F. Supp. 500, 503 (D.D.C. 1994).  "[J]urisdiction over an employee does not automatically follow from jurisdiction over the corporation which employs him." *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 n.13 (1984); *see also D'Onofrio*, 534 F. Supp. 2d at 90-91; *Flocco v. State Farm Mut. Auto. Ins. Co.*, 752 A.2d 147, 162 (2000).  "A court does not have jurisdiction over individual officers and employees of a corporation just because the court has jurisdiction over the corporation.  Personal jurisdiction over the employees or officers of a corporation in their individual capacities must be based on their personal contacts with the forum and not their acts and contacts carried out solely in a corporate capacity." *Flocco*, 752 A.2d at 162-163 (citing *Quinto v. Legal Times*, 506 F. Supp. 554, 558 (D.D.C. 1981) (internal citations omitted)); *see also D'Onofrio*, 534 F. Supp. 2d at 90; *Kopff*, 425 F. Supp. 2d at 84.

When personal jurisdiction is challenged, the plaintiff has the burden of establishing a factual basis for asserting personal jurisdiction over each individual non-resident defendant. *See* Fed. R. Civ. P. 12(b)(2); *see also Atlantigas Corp. v. Nisource, Inc.*, 290 F. Supp. 2d 34, 42 (D.D.C. 2003).  To withstand a motion to dismiss for lack of personal jurisdiction, a plaintiff "must make a prima facie showing of the pertinent jurisdictional facts" by alleging "specific acts

7

connecting defendants with the forum." *First Chicago Int'l v. United Exch. Co., Ltd.*, 836 F.2d

1375, 1378 (D.C. Cir. 1988). The plaintiff must "allege specific facts on which personal

jurisdiction can be based; it cannot rely on conclusory allegations." *Atlantigas Corp.*, 290 F.

Supp. 2d at 42. Factual allegations concerning multiple defendants cannot be aggregated to find

personal jurisdiction over any individual defendant. *Id.* Bare allegations of agency are

insufficient to establish personal jurisdiction. *First Chicago Int'l*, 836 F.2d at 1379. The court is

not required to treat Plaintiff's allegations as true; rather, it may receive affidavits and other

evidence to determine whether jurisdiction exists. *Atlantigas Corp.*, 290 F. Supp. 2d at 42.

### 1.    No Basis Exists To Assert General Personal Jurisdiction Over Mr. Anderson.

Plaintiff has not, and cannot, establish a basis for general personal jurisdiction over Mr.

Anderson pursuant to D.C. Code § 13-422. Plaintiff admits that Mr. Anderson is not a resident

of the District of Columbia. *See* PFAC ¶ 12 ("Upon information and belief, Mr. Anderson

resides at 2100 West 56th Street, Mission Hills, Kansas 66208."). Moreover, it is indisputable

that Mr. Anderson lives in Kansas, works in Kansas City, Missouri, and makes his decisions in a

corporate capacity out of NFI and NMI's offices located in Kansas City, Missouri. Anderson

Decl. ¶¶ 6, 7.

Mr. Anderson's situation is akin to that of the defendants in *D'Onofrio,* in which a female

employee brought suit against her employer and chief financial officer and head of human

resources in their individual capacities. *D'Onofrio*, 534 F. Supp. 2d at 88. The court dismissed

plaintiff's claim against the executives, holding that the court lacked personal jurisdiction over

the executives. *Id.* at 93. In doing so, the court reasoned that the plaintiff had not established

that the executives had "continuous and systematic contact" with the District of Columbia where

both executives lived and worked in Texas, neither regularly did business with the District of

Columbia, neither solicited business within the District, and one executive had visited the
District twice and the other twelve times within the past decade. *Id.* at 90.

In short, Plaintiff has alleged no facts regarding Mr. Anderson's personal conduct vis-à-
vis the District of Columbia to satisfy the steep requirement of continuous and systematic
contacts with this jurisdiction sufficient to impose general jurisdiction. *See D'Onofrio*, 534 F.
Supp. 2d at 90. Accordingly, there is no basis for this Court to exercise general jurisdiction over
Mr. Anderson.

> **2.    No Basis Exists To Assert Specific Personal Jurisdiction Over Mr.
> Anderson.**

There is also no basis to assert specific personal jurisdiction over Mr. Anderson under the
District of Columbia's long-arm statute, D.C. Code § 13-423(a). All of the alleged conduct
complained of in the PFAC consists of acts and omissions undertaken by Mr. Anderson in a
corporate capacity as an officer of NFI and NMI, and it is established law that such conduct is
insufficient to confer specific personal jurisdiction over an individual under the District of
Columbia's long-arm statute. *Quinto*, 506 F. Supp. at 558; *Wiggins*, 853 F. Supp. at 503; *Flocco*,
752 A.2d at 162.

The only charging allegations explicitly naming Mr. Anderson are that he "is the
President, Chief Operating Officer, and co-founder of NovaStar Financial, Inc. Mr. Anderson is
also the President of NovaStar Mortgage, Inc. Mr. Anderson personally developed and
implemented the discriminatory lending policies challenged in this First Amended Complaint."
PFAC ¶ 12. The rest of the allegations in the PFAC refer only to "NovaStar," which is vaguely,
and improperly, defined as NFI, NMI and Mr. Anderson, collectively (PFAC ¶ 1), and allege
conduct previously attributed solely to NFI and NMI. *See* Compl. ¶¶ 14-27, 31-32, 34-35, 37;
PFAC ¶¶ 15-28, 32-33, 35-36, 38. The Proposed First Amended Complaint (and Plaintiff's

Motion to Amend the Complaint) are devoid of any allegations showing that Mr. Anderson personally: 1) transacts business in the District; 2) contracts to supply services in the District; 3) causes tortious injury in the District by an act or omission in the District; or 4) causes tortious injury in the District by an act or omission outside the District, as defined in D.C. Code § 13-423(a).

Plaintiff has not – because it cannot – allege any specific factual allegations warranting this Court's jurisdiction over Mr. Anderson pursuant to the District of Columbia's long-arm statute. Mr. Anderson resides in Mission Hills, Kansas. Anderson Decl. ¶ 1. He does not personally maintain an office in the District of Columbia. He works in NFI and NMI's offices located in Kansas City, Missouri, and ordinarily make his business decisions as an officer of NFI and NMI from there. *Id.* ¶¶ 6, 7. Accordingly, none of the alleged policy decisions and business transactions complained of by Plaintiff was made by Mr. Anderson in an individual capacity or within the District of Columbia. Further, Mr. Anderson does not own any real property located in the District of Columbia, *id.* ¶ 2; he does not conduct any personal business in an individual capacity in the District of Columbia, *id.* ¶ 8; nor has he personally entered into any contracts to supply services in an individual capacity in the District of Columbia. *Id.* ¶ 9.

Mr. Anderson's situation is analogous to that of the defendants in a line of cases involving actions in which the courts of this District refused to assert jurisdiction over non-resident executives sued as individuals for acts undertaken in a corporate capacity, including *Quinto v. Legal Times, Wiggins v. Equifax*, and *Richard v. Bell Atlantic Corp.* In *Quinto*, the court held that it did not have personal jurisdiction over the defendants, who were New Jersey residents and corporate officers and part owners of a parent company of a District of Columbia newspaper which published an alleged copyright infringing article. *Quinto*, 506 F. Supp. at 558.

10

The court reasoned that, although the defendants may have conducted substantial business in the District, they were not subject to *in personam* jurisdiction under the District's long-arm statute because such activities were conducted on behalf of the corporation, and there were no allegations that they conducted any business as individuals. *Id.* Moreover, the defendants' alleged failure to supervise the activities of the subsidiary in a manner that would have prevented the infringement could not be considered acts or omissions of the non-resident executives in their individual capacities. Thus, the court concluded:

> While the Glassers may have conducted substantial business in the District of Columbia, their activities were conducted on behalf of the corporation. There is no allegation that they conducted any business as individuals, and as a result, sections (a)(1) and (a)(4) of the Long-Arm Statute are not available to plaintiff as a basis for jurisdiction. Similarly, the Glassers' failure to supervise the activities of the Legal Times in a manner which would have prevented republication of plaintiff's article cannot be considered acts or omissions in their individual capacities, since any actions they might have taken would have been in their official capacities. Thus, jurisdiction cannot be conferred by section (a)(3).

*Id.* (citation omitted).

In *Wiggins,* the court found it could not exercise personal jurisdiction over two supervisors in the corporate defendant's McLean, Virginia, office who allegedly directed and supervised subordinates engaged in illegal activities in the District. *Wiggins*, 853 F. Supp. at 503. The court held that "[p]ersonal jurisdiction over the employees or officers of a corporation in their individual capacities must be based on their personal contacts with the forum and not their acts and contacts carried out solely in a corporate capacity." *Id.* In instances where contacts with the forum were exclusively in relation to defendants' corporate responsibility, the court reasoned, "defendants are clearly not 'doing business' with the District of Columbia." *Id.* Moreover, the court added that "[t]he fact that [defendants] may have acted in a supervisory

capacity over persons with contacts with the District also fails to create personal jurisdiction." *Id.*

Similarly, in *Richard,* the court held that "plaintiffs have failed to plead sufficient jurisdictional facts, because acts committed within the scope of employment cannot be imputed to the individual defendants to establish personal jurisdiction over them." *Richard v. Bell Atlantic Corp., Inc.*, 976 F. Supp. 40, 50 (D.D.C. 1997); *see also Flocco,* 752 A.2d at 163 ("We agree with the analysis of the courts in *Wiggins* and *Richard.*"); *D'Onofrio,* 534 F. Supp. 2d at 91-92; *Kopff,* 425 F. Supp. 2d at 83-89.

Here, as in *Quinto, Wiggins,* and *Richard,* glaringly absent from the Proposed First Amended Complaint (or the Motion to Amend the Complaint) are any allegations showing that Mr. Anderson conducted any business or undertook any acts or omissions complained of in his individual capacity to mandate the imposition of *in personam* jurisdiction.

Even assuming, *arguendo,* that Mr. Anderson was somehow acting outside of his corporate capacity as an officer of NMI and NFI, there are no allegations in the PFAC or Plaintiff's Opening Brief showing that the exercise of personal jurisdiction over Mr. Anderson would satisfy due process requirements. *Ferrara,* 54 F.3d at 828. The Due Process Clause prohibits the exercise of jurisdiction over a non-resident defendant unless the defendant has certain minimum contacts with the forum state such that the exercise of personal jurisdiction is reasonable and "does not offend traditional notions of fair play and substantial justice." *World-Wide Volkswagen Corp.,* 444 U.S. at 292 (internal quotes omitted). To be subject to jurisdiction, a non-resident defendant must have purposefully availed himself or herself of the privileges and protections of the forum state's laws such that it should reasonably anticipate being haled into court there. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472 (1985) (citation omitted). To

assess the reasonableness of exercising jurisdiction over a non-resident defendant where minimum contacts have been established, the court must also consider the following factors: (1) the burden on the defendant; (2) the interests of the forum in adjudicating the case; and (3) the plaintiff's interest in obtaining relief. *Id.* at 477.

Here, these factors manifestly dictate against the exercise of personal jurisdiction over Mr. Anderson. As an initial matter, there are no allegations that Mr. Anderson has "minimum contacts" with the District of Columbia "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *World-Wide Volkswagen Corp.,* 444 U.S. at 292 (internal quotes omitted). Moreover, Mr. Anderson is admittedly a resident of the State of Kansas (PFAC ¶ 12) who works in the State of Missouri, and ordinarily makes his business decisions as an officer of NMI and NFI from there. Anderson Decl. ¶¶ 6, 7. Forcing him to defend a lawsuit out-of-state over a thousand miles from his home would clearly be burdensome. Further, Plaintiff fails to identify any particular interest this forum has in adjudicating its claims against Mr. Anderson. Finally, Plaintiff here is complaining about certain lending practices of NMI. There is nothing to indicate that the relief being sought cannot be obtained against the corporate defendants. Thus, Plaintiff has not – and cannot – establish that exercising personal jurisdiction over Mr. Anderson would satisfy the Due Process Clause.

In short, there are no grounds for this Court to assert personal jurisdiction – be it general or specific – over Mr. Anderson. Accordingly, amendment of the Complaint would be futile because Plaintiff's claim against Mr. Anderson would not survive a motion to dismiss for lack of personal jurisdiction. Thus, Plaintiff's Motion to Amend the Complaint should be denied on the basis of futility.

**B.    Plaintiff's Claim Against Mr. Anderson Is Frivolous, If Not Malicious.**

Stripped to its core, Plaintiff contends that NFI and NMI have invidiously discriminated against Indians, African-Americans, Latinos and the disabled because of NMI's refusal to diverge from its business model of only originating loans on properties that were acceptable to its investors in the secondary market. *See* Compl. ¶¶ 14-15, 18, 24, 37; Opening Brief, Exhibit 1, Attachment 2; PFAC, Exhibit A.  Accordingly, Plaintiff takes issue with the business judgment of NMI in allegedly choosing not to participate in the Section 184 Program; refusing, for a period of time, to lend on row houses in Baltimore because of rampant appraisal fraud; and choosing not to lend on residential properties that are used for commercial purposes (such as adult foster care). *See* Compl. ¶¶ 14-15, 18, 24, 37; Opening Brief, Exhibit 1, Attachment 2. With its Motion to Amend the Complaint and the allegations in the PFAC, Plaintiff takes these contentions one step further by accusing an officer of NFI and NMI, Mr. Anderson, of personally discriminating against American Indians, African-Americans, Latinos, and persons with disabilities. *See* PFAC ¶ 1, 12, 15-16, 19, 25, 38.  In support of these serious allegations, Plaintiff conclusorily states that "Mr. Anderson personally developed and implemented the discriminatory lending policies challenged in this First Amended Complaint."  PFAC ¶ 12.

It has been recognized that, "[r]acial or religious discrimination is odious but a frivolous or malicious charge of such conduct . . . is at least equally obnoxious." *Carrion v. Yeshiva Univ.,* 535 F.2d 722, 728 (2d Cir. 1976).  Mr. Anderson is now faced with such a frivolous and malicious charge.  The sole stated basis for Plaintiff's joinder of Mr. Anderson as a defendant in this action is NMI's responses to three Interrogatories propounded by Plaintiff.  Opening Brief, p. 2-3.  Interrogatories Nos. 2, 6 and 8 asked NMI to "[i]dentify and describe in detail the role of all individuals responsible for NovaStar's 'policy regarding making loans secured by properties

14

located on Indian reservations or in Indian Country,' 'properties used for adult foster care,' and

'row houses in Baltimore, Maryland.'" Opening Brief, Exhibit 1, Attachment 2.  In response,

NMI objected to the term "responsible for" as used in Interrogatories 2, 6 and 8, as vague and

ambiguous, then proceeded to attempt to respond in good faith by concluding, "Notwithstanding

the foregoing objections and without waiver of the same, NMI responds as follows:  Lance

Anderson, President of NMI and President of NFI."  *Id.*  Entirely ignoring NMI's objections,

Plaintiff drew its own conclusion about the meaning of "responsible for" and proceeded in haste

to attempt to amend the Complaint to add a "frivolous [,] malicious charge" of discrimination

against Mr. Anderson personally.[2]  Such a conclusion was unwarranted given the information

already provided by NMI in its responses to Plaintiff's written discovery.  *See* Opening Brief,

Exhibit 1, Attachment 2.

As NMI stated in its response to Interrogatory No. 1, which requested that NMI provide a

"detailed explanation of and state the reason(s) for NovaStar's policy regarding making loans

secured by properties located on Indian reservations or in Indian Country:"

> NMI's policy regarding lending on property secured on Indian reservations or on Indian
> Country is rooted in NMI's business of making non-conforming loans that meet uniform
> criteria for sale on the secondary market.  Secondary market sales depend on a warranty
> of clear title to the collateral in the event of default.  NMI's policy regarding lending on
> property secured on Indian reservations or on Indian Country also stems from the unique
> risks and additional costs attendant to such loans.  Of primary concern is the fact that a
> lender cannot perfect title on property on Indian reservations or Indian Country.  NMI
> was generally aware of court decisions holding that Indian tribes have authority to license
> and regulate non-Indians engaging in commercial transactions with the tribe or its
> members; consequently, lenders must recognize tribal sovereignty.  NMI was also aware
> of other unique issues and risks related to the perfection of title by a lender on Indian
> reservation property include, but are not limited to:  the fact that most Indian land is held
> in trust by federal or state governments and cannot be encumbered by a mortgage lien;

---

[2] NMI interpreted "responsible for" in the context of Interrogatory Nos. 2, 6 and 8 to mean a request for the identity
of the highest-ranking officer at NMI who theoretically has ultimate authority for NMI's policies -- its president.  It
did not interpret "responsible for" to mean the individual who formulated and/or personally implemented the
policies at issue here.  Moreover, Mr. Anderson was one of several officers at NMI, and NFI, who, in turn,
ultimately answered to a board of directors and/or shareholders.

the inability to foreclose on mortgages on individual Indian trust land in state courts; the limited market from which lenders can obtain data for the purposes of determining property values; the general absence of codified tribal commercial laws and resulting uncertainty of foreclosure remedies; the delays caused by the Bureau of Indian Affair's supervision of loan approvals and issuance of title status reports; and the highly fractionated ownership of reservation land.

Moreover, based on its review of the program manual for HUD's Section 184 Indian Housing Loan Guarantee Program, and a review of other information related to the Section 184 program, NMI asserts that there are inherent general market limitations on the use of that program. First, there is a limited market of Section 184 borrowers. Since its inception in 1992 through mid-June 2007, the program funded a total of just 4,500 loans. Loan guarantee production grew from 89 loans totaling $9.8 million in fiscal year 2001 to 634 loans totaling $76.8 million in fiscal year 2005. The total loan guarantee production for this four-year period was 3,227 loans. The Program, however, has established a long-term goal of guaranteeing only 2,000 loans per annum by 2011. Fewer than half of tribes (approximately 200 as of June 2006) have been approved by HUD for participation in the Section 184 Program. Second, there is a limited secondary mortgage market for Section 184 loans that consists almost exclusively of government-sponsored enterprises: Fannie Mae, Freddie Mac, Ginnie Mae, and some state housing finance agencies. Ginnie Mae purchases the largest number of loans, estimated to be 45% of all Section 184 loans originated. Third, because servicing can be transferred only to Program-eligible lenders, there is a limited servicing transfer market. Furthermore, according to separate resolutions adopted by the National Congress of American Indians in 2004 and 2005 the Program is "severely underutilized"; "there exist a number of obstacles to greater utilization of the Section 184 Loan Program, including substantial delays in obtaining necessary documentation from the Bureau of Indian Affairs (BIA), burdensome and duplicative environmental review requirements, and excessive paperwork burdens that make the program unpopular among lenders"; and "obtaining a Section 184 Guaranteed Loan is a very slow, laborious and difficult process which creates a disincentive for lenders to participate."

Finally, the Section 184 Program imposes additional, onerous requirements on lenders that are above and beyond standard loan processing, underwriting, closing and servicing practices, as described in HUD's Processing Guidelines for the Program. NMI is producing with these responses a copy of the Processing Guidelines. According to those Guidelines, the requirements include, but are not limited to, the following:

- Rates cannot be adjustable, and loan must be fully amortized (*i.e.*, no balloon loans).
- Maximum mortgage amount cannot exceed 150% FHA limits for the locality.
- Lien instruments for allocated and trust lands must be recorded with BIA and possibly also with the tribe, depending on tribe requirements.
- Lenders are required to participate in program-specific training to become eligible lenders (per 2006 OMB program assessment).

- Lender must be familiar with all applicable tribal laws in order to certify that will comply with those laws. There are approximately 200 tribes participating in the Program.
- Lender is subject to HUD civil penalties and indemnification obligations if lender fails to comply with HUD loan processing requirements or does not comply with applicable tribal laws.
- Lender must create a written quality control plan specifically for the origination and servicing of Section 184 loans.
- Lender underwriter must be familiar with HUD requirements for appraising property on Indian reservations in order to evaluate collateral, appraiser's valuation methodology, maximum mortgage amount, and loan terms.
- Lender must submit loan application packages to HUD Office of Native American Programs to request a firm commitment and case number to qualify as a Section 184 loan.
- Lender must use HUD's Credit Alert Interactive Voice Response System to screen borrowers.
- Lender must acquire a title status report from BIA for tribal trust and individual allotted trust lands. Title status reports issued late by the BIA can cause delays that exceed the Section 184 program delivery schedule.
- Lender must determine whether the tribe has a tribal court system.
- Lender must prepare a Section 184 Rider to the mortgage instrument.
- Lender must establish escrow accounts and is responsible for determining whether tribe charges property taxes and, if so, what the amount of those tribal taxes is.
- In the event of a default, lender must ensure that defaulted borrower receives counseling from a HUD-approved counseling agency before initiating foreclosure or assigning the loan to HUD.
- At the end of each quarter, servicing lender must submit to HUD for each Section 184 loan a report stating the borrower's name, case number, unpaid principal balance, and next payment due date.
- Before borrower has missed 3 monthly installments and prior to beginning any foreclosure or assignment activity, lender must have a face-to-face interview with the borrower (if within a 200-mile radius), or make a reasonable effort to arrange such a meeting. Reasonable efforts include making at least one telephone call to borrower and sending one letter for the purpose of arranging the face-to-face interview.
- Lender-initiated foreclosure is regulated not only by HUD guidelines but also any applicable tribal laws. The property must be disposed of according to HUD guidelines, including a requirement that the lender must endeavor to sell trust land to a Native American buyer.
- HUD may reject assignments of defaulted mortgages if HUD determines that assignment is not in HUD's "best interest."
- Lender must establish a system for management review of loans to assure that appropriate decisions are made before submitting the defaulted mortgage to HUD for assignment.
- Lender must submit extensive documentation to HUD to qualify for an assignment of a defaulted mortgage.

Response to Interrogatory No. 1.[3]

When queried about "NovaStar's policy regarding making loans secured by properties used for adult foster care" in Interrogatory No. 5, NMI forthrightly responded:

> Adult foster care facilities have either a commercial use or a mix of commercial and residential uses. Regardless, NMI's policy – as explained in Section 5 of the Program Manual produced in response to Plaintiff's First Set of Requests for Production of Documents to NMI – is to not make loans on *any* properties with either a commercial use or a mix of commercial and residential uses. The specific policy regarding loans secured by adult foster care facilities is simply an extension of this more general policy. There are significant differences between lending on residential properties and commercial properties. NMI's business model focuses on single-family residential properties.

Response to Interrogatory No. 5.

Finally, when asked to "[p]rovide a detailed explanation of and state the reason(s) for NovaStar's policy regarding making loans secured by row houses located in Baltimore, Maryland" in Interrogatory No. 7, NMI responded:

> NMI has been willing to make loans on row houses in Baltimore prior to January 2005 and since August 2006. In any event, prior to August 2006, there were legitimate, non-discriminatory reasons for not making loans secured by Baltimore row houses, particularly the substantial fraud associated with the flipping of such properties that is well known to the mortgage industry. It is well known in the lending industry that Baltimore row houses have been involved in property flipping schemes that have injured consumers and lenders alike. While the schemes may have diminished, they have not been eliminated, and the effect of the schemes presents a continuing problem for lenders and secondary mortgage market investors. Reliable appraisals on row houses are difficult, and in most cases impossible, to obtain because the massive amount of property flipping involving such houses creates substantial doubt as to the validity of any comparable property value, as well as the chain of title.
>
> Indeed, problems created by the schemes were recognized by HUD, which took action to protect the Federal Housing Administration ("FHA") loan program. Specifically, losses experienced by the FHA as a result of insured loans on properties involved in property flipping schemes caused HUD to propose and then adopt a rule on FHA loans specifically aimed at property flipping. The rule prohibits FHA financing on property to be sold less than 90 days after the property was acquired by the seller, and imposes restrictions on transactions in which the property will be sold soon, but not less than 90 days, after the property was acquired by the seller.

---

[3] NMI's complete responses to Interrogatory Nos. 1, 5, and 7 are attached as Exhibit B hereto.

In short, the policy of not lending on Baltimore row houses reflects the substantial concerns of, and risks to, the mortgage industry of the harm that results from property flipping.

Response to Interrogatory No. 7.

Read *in toto* with Plaintiff's Opening Brief, NMI's responses to Interrogatories Nos. 1, 2, 5, 6, 7 and 8 reveal the frivolity and maliciousness in Plaintiff's assertion that Mr. Anderson personally sought to discriminate against Indians, African-Americans, Latinos, and the disabled. NMI and NFI's lending policies relating to properties on Indian country and Indian reservations, Baltimore row houses and properties used for commercial or mixed-use purposes are justified by sound business reasons. There is simply no basis for attempting to impose personal liability on Mr. Anderson on the facts already disclosed to Plaintiff. Plaintiff's insistence on drawing conclusions contrary to the facts disclosed and asserting claims of racism and discrimination against Mr. Anderson on a personal level reek of malevolence. As the court in *Harris v. Marsh* aptly stated:

> [T]he mere fact that an individual may hold the keys to the courthouse door does not imply that he may enter with disregard for his actions therein or disdain for the rights of all other parties to the litigation. As the court has taken pains to note, the issue of racial discrimination in this nation is long-standing and remains a terribly serious one. Charges of racism, if proved, carry an enormously stigmatizing effect. Accordingly, such charges should only be leveled after careful investigation, thoughtful deliberation, and never without a reasonable basis in law and fact. This admonition becomes increasingly true as the number and intensity of the charges increase.

*Harris v. Marsh*, 679 F. Supp. 1204, 1221 (E.D.N.C. 1987) (footnote omitted) *rev'd in part and aff'd in part by Blue v. U.S. Dept. of Army*, 914 F.2d 525 (4th Cir. 1990). Plaintiff's motion to add Mr. Anderson as a defendant based solely on its unreasonable interpretations of NMI's interrogatory responses, combined with the facts already disclosed to Plaintiff in discovery, reveal that the claims of racism and discrimination leveled against Mr. Anderson are, at best,

frivolous, and at worst, malicious, in nature.[4]  Consequently, Plaintiff's Motion to Amend the Complaint should be denied on this independent basis.

## V.     CONCLUSION

Amendment of Plaintiff's Complaint to add Mr. Anderson as an individual defendant would be futile because the Court lacks of personal jurisdiction over him.  Amendment should also be denied because the accusations leveled against Mr. Anderson – which are solely based on his business judgment in a corporate capacity -- are frivolous, if not malicious.  Accordingly, Plaintiff's Motion to Amend the Complaint should be denied.[5]

Dated:     September 8, 2008                          Respectfully submitted,

                                                                  WEINER BRODSKY SIDMAN KIDER PC

                                                                  By:  /s/ David M. Souders
                                                                  Mitchel H. Kider (Bar No. 358531)
                                                                  David M. Souders (Bar No. 441491)
                                                                  1300 19th Street, NW, Fifth Floor
                                                                  Washington, DC 20036-1609
                                                                  Telephone: (202) 628-2000
                                                                  Facsimile: (202) 628-2011
                                                                  Email: kider@wbsk.com
                                                                  Email: souders@wbsk.com

F:\98054\054\Opposition to Plaintiff's Motion to Amend the Complaint.v2.doc

---

[4]  Plaintiff's successful amendment of the Complaint to add Mr. Anderson as a defendant would necessarily entail personal hardships for Mr. Andersons as an individual.  For example, Mr. Anderson will no longer be able to apply for a personal loan without disclosing that he is a defendant to this action.  A potential lender would have to take into consideration the relief requested in the Complaint prior to making a credit decision on any such application.

[5]  Pursuant to Local Rule 7(f), Defendants request oral argument on Plaintiff's Motion to Amend.

## CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of September, 2008, a copy of the foregoing

Defendants' Opposition to Plaintiff's Motion to Amend its Complaint was served via electronic

notification upon the following:

> John Peter Relman
> Bradley H. Blower
> Elena Grigera
> RELMAN & DANE, PLLC
> 1225 19th Street, N.W.
> Suite 600
> Washington, DC 20036-2456
> Phone: (202) 728-1888
> Fax: (202) 728-0848
> jrelman@relmanlaw.com
> bblower@relmanlaw.com
> egrigera@relmanlaw.com


           /s/ David M. Souders
          David M. Souders (Bar No. 441491)

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL COMMUNITY REINVESTMENT COALITION,    ) )  )  )  Plaintiff,   ) )  v.   ) )  NOVASTAR FINANCIAL, INC., and NOVASTAR MORTGAGE, INC.,   ) )  )  )  Defendants.   ) ) | Civil Action No. 07-861 (RCL) |

**ORDER**

Upon consideration of Plaintiff National Community Reinvestment Coalition's Motion

for Leave to Amend its Complaint to Join W. Lance Anderson as a Defendant, the opposition

filed by NovaStar Financial, Inc., and NovaStar Mortgage, Inc., and the record herein;

**IT IS HEREBY ORDERED** that plaintiff's Motion to Amend is **DENIED**.

**SO ORDERED**.

Dated: _____

_____
The Honorable Royce C. Lamberth
United States District Judge

The Clerk shall serve a copy of this order on:

David M. Souders
1300 19th Street, NW, Fifth Floor
Washington, DC 20036-1609
Phone: (202) 628-2000
Fax: (202) 628-2011
souders@wbsk.com

*Counsel for Defendants, NovaStar Financial, Inc. and NovaStar Mortgage, Inc.*

John Peter Relman
Bradley H. Blower
Elena Grigera
RELMAN & DANE, PLLC
1225 19th Street, N.W., Suite 600
Washington, DC 20036-2456
Phone: (202) 728-1888
Fax: (202) 728-0848
jrelman@relmanlaw.com
bblower@relmanlaw.com
egrigera@relmanlaw.com

*Counsel for Plaintiff, National Community Reinvestment Coalition*

F:\98054\054\lbpp1695oth Order.Amend.doc

**EXHIBIT A**

**TO**

**DEFENDANTS NOVASTAR FINANCIAL, INC
AND NOVASTAR MORTAGE, INC'S
OPPOSITION TO PLAINTIFF NATIONAL
COMMUNITY REINVESTMENT
COALITION'S MOTION TO AMEND ITS
COMPLAINT TO JOIN W. LANCE
ANDERSON AS A DEFENDANT**

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| NATIONAL COMMUNITY REINVESTMENT COALITION, | ) ) ) ) |  |
| Plaintiff, | ) ) ) |  |
| v. | ) ) | Civil Action No. 07-861 (RCL) |
| NOVASTAR FINANCIAL, INC. and NOVASTAR MORTGAGE, INC., | ) ) ) ) |  |
| Defendants. | ) ) |  |

### DECLARATION OF W. LANCE ANDERSON IN SUPPORT OF DEFENDANTS NOVASTAR FINANCIAL, INC. AND NOVASTAR MORTGAGE, INC.'S OPPOSITION TO PLAINTIFF NATIONAL COMMUNITY REINVESTMENT COALITION'S MOTION TO AMEND ITS COMPLAINT TO JOIN W. LANCE ANDERSON AS A DEFENDANT

I, W. Lance Anderson, pursuant to 28 U.S.C. § 1746, declare:

1.    I reside in Mission Hills, Kansas.

2.    I do not own any real property located in the District of Columbia.

3.    I do not maintain an office in the District of Columbia.

4.    NovaStar Financial, Inc.'s ("NFI") offices are located in Kansas City, Missouri.

5.    NovaStar Mortgage, Inc.'s ("NMI") offices are located in Kansas City, Missouri.

6.    As the President and Chief Operating Officer of NFI and President of NMI, I generally work from NMI and NFI's offices located in Kansas City, Missouri, and ordinarily make my business decisions as an officer of NFI and NMI from the aforementioned offices.

7.    None of the alleged policy decisions and business transactions complained of by Plaintiff National Community Reinvestment Coalition in the original Complaint or Proposed First Amended Complaint attached to Plaintiff's Motion to Amend alleged to have been made by me in an individual capacity would have been made in the District of Columbia, nor would any such decision have been made in the District of Columbia.

8.    I do not conduct any personal business in an individual capacity in the District of Columbia.

9.    I have not personally entered into any contracts to supply services in an individual capacity in the District of Columbia.

Executed this 5th day of September, 2008.

W. Lance Anderson

F:\98054\054\Anderson Dec. ISO Opposition to Motion to Amend Complaint.doc

# EXHIBIT B

## TO

## DEFENDANTS NOVASTAR FINANCIAL, INC. AND NOVASTAR MORTAGE, INC'S OPPOSITION TO PLAINTIFF NATIONAL COMMUNITY REINVESTMENT COALITION'S MOTION TO AMEND ITS COMPLAINT TO JOIN W. LANCE ANDERSON AS A DEFENDANT

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NATIONAL COMMUNITY REINVESTMENT COALITION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 1:07-cv-00861-RCL |
| NOVASTAR FINANCIAL, INC. | ) ) | |
| and | ) ) | |
| NOVASTAR MORTGAGE, INC., | ) ) | |
| Defendants. | ) ) ) | |

**DEFENDANT NOVASTAR MORTGAGE, INC.'S RESPONSES AND OBJECTIONS
TO PLAINTIFF NATIONAL COMMUNITY REINVESTMENT COALITION'S
FIRST SET OF INTERROGATORIES**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Defendant NovaStar

Mortgage, Inc. ("NMI"), hereby provides the following responses to the First Set of

Interrogatories ("Interrogatories") propounded by Plaintiff National Community Reinvestment

Coalition ("NCRC") as follows:

**GENERAL RESPONSE AND OBJECTIONS**

NMI makes the following General Response and Objections (hereinafter referred to

collectively as "General Response") to NCRC's Interrogatories. The objections in the General

Response apply to so many of the Interrogatories that, for convenience, they are set forth

immediately below and are not necessarily repeated after each Interrogatory to which an

objection is asserted. The assertion of the same, similar, or additional objections in the

individual objections to the Interrogatories, or the failure to assert any additional objection to a Interrogatory, does not waive any of NMI's objections as set forth below.

1.      NMI objects to the Interrogatories to the extent they seek to impose upon NMI greater or broader obligations than those imposed by the Federal Rules of Civil Procedure, or other applicable rules, or court order.

2.      NMI objects to the Interrogatories to the extent that they are oppressive or would require an undue burden or expense to respond.

3.      To the extent any Interrogatory may be construed as calling for the disclosure of privileged, confidential or immune information, including without limitation, information subject to the attorney-client privilege or attorney work product doctrine, NMI hereby claims such privileges and immunities and objects to the Interrogatories on those grounds.  Further, NMI objects to any Interrogatory to the extent it calls for information that is subject to and protected by the consulting-expert privilege, or any other applicable statutory or common-law privilege. Inadvertent disclosure of information subject to any privilege does not waive the privilege as to other information or documents regarding the same subject or content and does not waive NMI's right to object to the introduction of such privileged information or documents regarding the same subject or content and does not waive NMI's right to object to the introduction of such privileged information or documents into evidence.

4.      To the extent these Interrogatories demand the disclosure of information concerning the legal basis of its defense, NMI objects on the grounds that these Interrogatories call for mental impressions, conclusions, opinions, and/or legal theories of NMI's attorneys.

5.      NMI objects to the Interrogatories to the extent that any Interrogatory may be construed as seeking the disclosure of confidential commercial or proprietary information

protected by the right of privacy, trade secret privilege or any other applicable protection.  NMI objects to producing such information unless and until such production is subject to a suitable protective order entered in this case.  NMI objects to the production of any information or documents that are subject to a confidentiality agreement with a third party or a court-ordered confidentiality agreement.

      6.    NMI objects to NCRC's definitions and the Interrogatories in that Plaintiff collectively defines NMI and its parent company, NovaStar Financial, Inc. ("NFI"), as "NovaStar" and addresses Requests to "NovaStar" in such a manner as to imply that they are basically one entity with joint policies, practices and/or procedures.  Contrary to Plaintiff's allegation in its Complaint, NFI does not provide "underwriting guidelines for its loans" and, in fact, does not originate, service or securitize loans.  NFI's subsidiaries, including NMI, perform those actions.  NFI is simply a corporate parent.  Accordingly, any responses to the Requests addressed to "NovaStar" are deemed to be addressed to NMI only and thus, the responses contained herein are provided only on behalf of NMI only.

      7.    NMI objects to the Interrogatories to the extent they seek information that is not relevant to a claim or defense of a party and are beyond the scope prescribed by Fed. R. Civ. P. 26(b)(1), as amended.

      8.    NMI objects to the Interrogatories to the extent they seek information not in its possession, custody or control, including, but not limited to, information in the possession of its contractors, brokers, partners, investigators, sureties and/or indemnitors.

      9.    NMI objects to the Interrogatories to the extent they are vague, overbroad, unduly burdensome or oppressive.

10.    NMI objects to the Interrogatories to the extent that they seek current and

prospective information about NMI concerning NMI's lending policies.  NMI ceased originating

loans on October 12, 2007 and all information provided in response to the Interrogatories is

historical, including, but not limited to, filings by NMI with the U.S. Securities and Exchange

Commission.

The General Response, and any information ultimately disclosed thereto, are made and

produced solely for the limited purpose of this lawsuit.  Further, the General Response, and any

information ultimately disclosed thereto, is based upon NMI's perception and understanding of

the nature and type of information/documents requested.

NMI's responses will be based upon documents and information known and available to

NMI and its attorneys at the time it responds to these Interrogatories.  NMI presently has not

completed its investigation or analysis of the facts and issues relating to this case, and has not

completed its preparation for trial.  There may be other information or documents of which NMI

will become aware, of which it will come into possession at a later time which may relate to the

Interrogatories or to this General Response.  NMI reserves its right to amend and/or supplement

its responses if it learns of new documents or information relevant hereto, through discovery or

otherwise.  The General Response is given without prejudice to NMI's right to produce evidence

of any subsequently discovered information, documents or interpretations thereof, and/or to

supplement, modify, or otherwise change and/or amend this General Response and any

inadvertent errors or omissions which may be contained herein, in light of any information or

documents which they may subsequently discover.

NMI reserves its right to challenge the competency, relevancy, materiality, and

admissibility at trial, or any subsequent proceeding, in this or any other action, of any

information or documents it produces in response to the Interrogatories.  This General Response

is made subject to all objections as to competency, relevancy, materiality, propriety, and

admissibility, and any and all objection and grounds that would require the exclusion of any

statement made herein or of any document produced pursuant hereto, if such statement were

made by a witness present and testifying in trial, or if such document were shown to any witness

or marked for identification, all of which objections and grounds are reserved and may be

interposed at the time of trial.

The entirety of the foregoing General Response is hereby incorporated by this express

reference into each of the following Responses, rather than repeating it verbatim for each such

Response so that such Responses are not unduly lengthy or repetitious.

## INTERROGATORIES

## INTERROGATORY NO. 1:

Provide a detailed explanation of and state the reason(s) for NovaStar's policy regarding

making loans secured by properties located on Indian reservations or in Indian Country.

## RESPONSE TO INTERROGATORY NO. 1 :

NMI objects to this Interrogatory on the grounds that it is vague and ambiguous as to the

terms "NovaStar's policy regarding making loans secured by properties located on Indian

reservations or in Indian Country" as used in this context.  NMI further objects to the extent that

this Interrogatory seeks information protected by the attorney-client privilege and/or work

product doctrine.  NMI further objects to this Interrogatory on the grounds that it seeks to invade

NMI's confidential and proprietary information.  NMI further objects to this Request in that

Plaintiff collectively defines NMI and NFI as "NovaStar" and addresses the Requests to

"NovaStar" in such a manner as to imply that they are basically one entity with joint policies, practices and/or procedures when the contrary is true.

Notwithstanding the foregoing objections and without waiver of the same, NMI responds as follows: NMI's policy regarding lending on property secured on Indian reservations or on Indian Country is rooted in NMI's business of making non-conforming loans that meet uniform criteria for sale on the secondary market. Secondary market sales depend on a warranty of clear title to the collateral in the event of default. NMI's policy regarding lending on property secured on Indian reservations or on Indian Country also stems from the unique risks and additional costs attendant to such loans. Of primary concern is the fact that a lender cannot perfect title on property on Indian reservations or Indian Country. NMI was generally aware of court decisions holding that Indian tribes have authority to license and regulate non-Indians engaging in commercial transactions with the tribe or its members; consequently, lenders must recognize tribal sovereignty. NMI was also aware of other unique issues and risks related to the perfection of title by a lender on Indian reservation property include, but are not limited to: the fact that most Indian land is held in trust by federal or state governments and cannot be encumbered by a mortgage lien; the inability to foreclose on mortgages on individual Indian trust land in state courts; the limited market from which lenders can obtain data for the purposes of determining property values; the general absence of codified tribal commercial laws and resulting uncertainty of foreclosure remedies; the delays caused by the Bureau of Indian Affair's supervision of loan approvals and issuance of title status reports; and the highly fractionated ownership of reservation land.

Moreover, based on its review of the program manual for HUD's Section 184 Indian Housing Loan Guarantee Program, and a review of other information related to the Section 184

program, NMI asserts that there are inherent general market limitations on the use of that program. First, there is a limited market of Section 184 borrowers. Since its inception in 1992 through mid-June 2007, the program funded a total of just 4,500 loans. Loan guarantee production grew from 89 loans totaling $9.8 million in fiscal year 2001 to 634 loans totaling $76.8 million in fiscal year 2005. The total loan guarantee production for this four-year period was 3,227 loans. The Program, however, has established a long-term goal of guaranteeing only 2,000 loans per annum by 2011. Fewer than half of tribes (approximately 200 as of June 2006) have been approved by HUD for participation in the Section 184 Program. Second, there is a limited secondary mortgage market for Section 184 loans that consists almost exclusively of government-sponsored enterprises: Fannie Mae, Freddie Mac, Ginnie Mae, and some state housing finance agencies. Ginnie Mae purchases the largest number of loans, estimated to be 45% of all Section 184 loans originated. Third, because servicing can be transferred only to Program-eligible lenders, there is a limited servicing transfer market. Furthermore, according to separate resolutions adopted by the National Congress of American Indians in 2004 and 2005 the Program is "severely underutilized"; "there exist a number of obstacles to greater utilization of the Section 184 Loan Program, including substantial delays in obtaining necessary documentation from the Bureau of Indian Affairs (BIA), burdensome and duplicative environmental review requirements, and excessive paperwork burdens that make the program unpopular among lenders"; and "obtaining a Section 184 Guaranteed Loan is a very slow, laborious and difficult process which creates a disincentive for lenders to participate."

Finally, the Section 184 Program imposes additional, onerous requirements on lenders that are above and beyond standard loan processing, underwriting, closing and servicing practices, as described in HUD's Processing Guidelines for the Program. NMI is producing with

these responses a copy of the Processing Guidelines. According to those Guidelines, the

requirements include, but are not limited to, the following:

- Rates cannot be adjustable, and loan must be fully amortized (*i.e.*, no balloon loans).
- Maximum mortgage amount cannot exceed 150% FHA limits for the locality.
- Lien instruments for allocated and trust lands must be recorded with BIA and possibly also with the tribe, depending on tribe requirements.
- Lenders are required to participate in program-specific training to become eligible lenders (per 2006 OMB program assessment).
- Lender must be familiar with all applicable tribal laws in order to certify that will comply with those laws. There are approximately 200 tribes participating in the Program.
- Lender is subject to HUD civil penalties and indemnification obligations if lender fails to comply with HUD loan processing requirements or does not comply with applicable tribal laws.
- Lender must create a written quality control plan specifically for the origination and servicing of Section 184 loans.
- Lender underwriter must be familiar with HUD requirements for appraising property on Indian reservations in order to evaluate collateral, appraiser's valuation methodology, maximum mortgage amount, and loan terms.
- Lender must submit loan application packages to HUD Office of Native American Programs to request a firm commitment and case number to qualify as a Section 184 loan.
- Lender must use HUD's Credit Alert Interactive Voice Response System to screen borrowers.
- Lender must acquire a title status report from BIA for tribal trust and individual allotted trust lands. Title status reports issued late by the BIA can cause delays that exceed the Section 184 program delivery schedule.
- Lender must determine whether the tribe has a tribal court system.
- Lender must prepare a Section 184 Rider to the mortgage instrument.
- Lender must establish escrow accounts and is responsible for determining whether tribe charges property taxes and, if so, what the amount of those tribal taxes is.
- In the event of a default, lender must ensure that defaulted borrower receives counseling from a HUD-approved counseling agency before initiating foreclosure or assigning the loan to HUD.
- At the end of each quarter, servicing lender must submit to HUD for each Section 184 loan a report stating the borrower's name, case number, unpaid principal balance, and next payment due date.
- Before borrower has missed 3 monthly installments and prior to beginning any foreclosure or assignment activity, lender must have a face-to-face interview with the borrower (if within a 200-mile radius), or make a reasonable effort to arrange such a meeting. Reasonable efforts include making at least one telephone call to borrower and sending one letter for the purpose of arranging the face-to-face interview.
- Lender-initiated foreclosure is regulated not only by HUD guidelines but also any applicable tribal laws. The property must be disposed of according to HUD guidelines,

8

including a requirement that the lender must endeavor to sell trust land to a Native
American buyer.

- HUD may reject assignments of defaulted mortgages if HUD determines that assignment
  is not in HUD's "best interest."
- Lender must establish a system for management review of loans to assure that
  appropriate decisions are made before submitting the defaulted mortgage to HUD for
  assignment.
- Lender must submit extensive documentation to HUD to qualify for an assignment of a
  defaulted mortgage.

## INTERROGATORY NO. 2:

Identify and describe in detail the role of all individuals responsible for NovaStar's

policy described in response to Interrogatory No. 1.

## RESPONSE TO INTERROGATORY NO. 2:

NMI objects to this Interrogatory on the grounds that it is vague and ambiguous as to the

terms "responsible for" and "NovaStar's policy described in response to Interrogatory No. 1" as

used in this context. NMI further objects to this Request in that Plaintiff collectively defines

NMI and NFI as "NovaStar" and addresses the Requests to "NovaStar" in such a manner as to

imply that they are basically one entity with joint policies, practices and/or procedures when the

contrary is true.

Notwithstanding the foregoing objections and without waiver of the same, NMI responds

as follows: Lance Anderson, President of NMI and President of NFI.

## INTERROGATORY NO. 3:

Identify and describe in detail the role of all individuals involved in any decision by

NovaStar to participate or not to participate in the Section 184 Indian Home Loan Guarantee

Program.

## RESPONSE TO INTERROGATORY NO. 3:

Notwithstanding the foregoing objections and without waiver of the same, NMI responds as follows:  See Response to Interrogatory No. 3.

**INTERROGATORY NO. 5:**

Provide a detailed explanation of and state the reason(s) for NovaStar's policy regarding making loans secured by properties used for adult foster care.

**RESPONSE TO INTERROGATORY NO. 5:**

NMI objects to this Interrogatory on the grounds that it is vague and ambiguous as to the terms "NovaStar's policy regarding making loans secured by properties used for adult foster care" as used in this context.  NMI further objects to the extent that this Interrogatory seeks information protected by the attorney-client privilege and/or work product doctrine.  NMI further objects to this Interrogatory on the grounds that it seeks to invade NMI's confidential and proprietary information.  NMI further objects to this Request in that Plaintiff collectively defines NMI and NFI as "NovaStar" and addresses the Requests to "NovaStar" in such a manner as to imply that they are basically one entity with joint policies, practices and/or procedures when the contrary is true.

Notwithstanding the foregoing objections and without waiver of the same, NMI responds as follows:  Adult foster care facilities have either a commercial use or a mix of commercial and residential uses.  Regardless, NMI's policy -- as explained in Section 5 of the Program Manual produced in response to Plaintiff's First Set of Requests for Production of Documents to NMI -- is to not make loans on *any* properties with either a commercial use or a mix of commercial and residential uses.  The specific policy regarding loans secured by adult foster care facilities is simply an extension of this more general policy.  There are significant differences between

11

lending on residential properties and commercial properties. NMI's business model focuses on single-family residential properties.

**INTERROGATORY NO. 6:**

Identify and describe in detail the role of all individuals responsible for NovaStar's policy described in response to Interrogatory No.5.

**RESPONSE TO INTERROGATORY NO. 6:**

NMI objects to this Interrogatory on the grounds that it is vague and ambiguous as to the terms "responsible for" and "NovaStar's policy described in response to Interrogatory No. 5" as used in this context. NMI further objects to this Request in that Plaintiff collectively defines NMI and NFI as "NovaStar" and addresses the Requests to "NovaStar" in such a manner as to imply that they are basically one entity with joint policies, practices and/or procedures when the contrary is true.

Notwithstanding the foregoing objections and without waiver of the same, NMI responds as follows: Lance Anderson, President of NMI and President of NFI.

**INTERROGATORY NO. 7:**

Provide a detailed explanation of and state the reason(s) for NovaStar's policy regarding making loans secured by row houses located in Baltimore, Maryland.

**RESPONSE TO INTERROGATORY NO. 7:**

NMI objects to this Interrogatory on the grounds that it is vague and ambiguous as to the terms "NovaStar's policy regarding making loans secured by row houses located in Baltimore, Maryland" as used in this context. NMI further objects to the extent that this Interrogatory seeks information protected by the attorney-client privilege and/or work product doctrine. NMI further objects to this Interrogatory on the grounds that it seeks to invade NMI's confidential and

proprietary information.  NMI further objects to this Request in that Plaintiff collectively defines

NMI and NFI as "NovaStar" and addresses the Requests to "NovaStar" in such a manner as to

imply that they are basically one entity with joint policies, practices and/or procedures when the

contrary is true.

Notwithstanding the foregoing objections and without waiver of the same, NMI responds

as follows:  NMI has been willing to make loans on row houses in Baltimore prior to January

2005 and since August 2006.  In any event, prior to August 2006, there were legitimate, non-

discriminatory reasons for not making loans secured by Baltimore row houses, particularly the

substantial fraud associated with the flipping of such properties that is well known to the

mortgage industry.  It is well known in the lending industry that Baltimore row houses have been

involved in property flipping schemes that have injured consumers and lenders alike.  While the

schemes may have diminished, they have not been eliminated, and the effect of the schemes

presents a continuing problem for lenders and secondary mortgage market investors.  Reliable

appraisals on row houses are difficult, and in most cases impossible, to obtain because the

massive amount of property flipping involving such houses creates substantial doubt as to the

validity of any comparable property value, as well as the chain of title.

Indeed, problems created by the schemes were recognized by HUD, which took action to

protect the Federal Housing Administration ("FHA") loan program.  Specifically, losses

experienced by the FHA as a result of insured loans on properties involved in property flipping

schemes caused HUD to propose and then adopt a rule on FHA loans specifically aimed at

property flipping.  The rule prohibits FHA financing on property to be sold less than 90 days

after the property was acquired by the seller, and imposes restrictions on transactions in which

13

the property will be sold soon, but not less than 90 days, after the property was acquired by the seller.

In short, the policy of not lending on Baltimore row houses reflects the substantial concerns of, and risks to, the mortgage industry of the harm that results from property flipping.

**INTERROGATORY NO. 8**:

Identify and describe in detail the role of all individuals responsible for NovaStar's policy described in response to Interrogatory No.7.

**RESPONSE TO INTERROGATORY NO. 8:**

NMI objects to this Interrogatory on the grounds that it is vague and ambiguous as to the terms "responsible for" and "NovaStar's policy described in response to Interrogatory No. 7" as used in this context. NMI further objects to this Request in that Plaintiff collectively defines NMI and NFI as "NovaStar" and addresses the Requests to "NovaStar" in such a manner as to imply that they are basically one entity with joint policies, practices and/or procedures when the contrary is true.

Notwithstanding the foregoing objections and without waiver of the same, NMI responds as follows: Lance Anderson, President of NMI and President of NFI.

**INTERROGATORY NO. 9**:

Identify all persons who are officers, directors, and/or employees of both NovaStar Financial and NovaStar Mortgage.

**RESPONSE TO INTERROGATORY NO. 9:**

NMI objects to this Interrogatory on the grounds that it is impermissibly compound.

14